## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| TEXAS STATE LULAC; VOTO LATINO,<br><br>                    Plaintiffs,<br><br>        v.<br><br>BRUCE ELFANT, in his official capacity as the Travis County Tax Assessor-Collector; JACQUELYN CALLANEN, in her official capacity as the Bexar County Elections Administrator; ISABEL LONGORIA, in her official capacity as the Harris County Elections Administrator; YVONNE RAMÓN, in her official capacity as the Hidalgo County Elections Administrator; MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator; LISA WISE, in her official capacity as the El Paso County Elections Administrator,<br><br>                    Defendants. | Civil Action<br><br>Case No. ___1:21-cv-546___<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution** |

Plaintiffs TEXAS STATE LULAC and VOTO LATINO, by and through their undersigned counsel, file this COMPLAINT for DECLARATORY and INJUNCTIVE RELIEF against Defendants BRUCE ELFANT, in his official capacity as the Travis County Tax Assessor-Collector, JACQUELYN CALLANEN, in her official capacity as the Bexar County Elections Administrator, ISABEL LONGORIA, in her official capacity as the Harris County Elections Administrator, YVONNE RAMÓN, in her official capacity as the Hidalgo County Elections Administrator, MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator, and LISA WISE, in her official capacity as the El Paso County Elections Administrator, and allege as follows:

## NATURE OF CASE

1.     Texas has long struggled with voter turnout, often seeing some of the nation's lowest rates of electoral participation. The cause of this consistently low voter turnout is clear: the State's voting laws, which are the most restrictive in the United States.

2.     Despite the difficulties imposed on them by both the Election Code and the actions of Republican officials and lawmakers, Texas voters, including the State's growing populations of young voters and voters of color, have turned out in record numbers during recent elections.

3.     In spite of—and likely because of—the high turnout among young and minority voters, one of the top priorities of the 87th Texas Legislature was passing new laws to further restrict access to the franchise.

4.     During the 2021 legislative session—mere months after Texas officials sought to overturn the presidential election results and disenfranchise millions of voters in *other states* following the defeat of former president Donald Trump, and on the heels of what the State's elections administrators described as a safe and secure election—the Texas Legislature introduced no fewer than 50 bills to restrict access to voting in all forms.

5.     Among the bills passed by one or both chambers of the Legislature during this past session were measures to restrict access to early and absentee voting, empower partisan poll watchers to harass and intimidate voters, and make it easier to overturn election results (Senate Bill 7); restrict the ability of local election officials to exercise their discretion and expand access to the franchise (Senate Bill 1675); impose additional requirements on Texans who vote absentee due to disabilities (House Bill 3920); and permit election judges to carry firearms inside polling places (House Bill 530).

6.     This lawsuit challenges one of those bills, Senate Bill 1111 ("SB 1111"), which imposes vague, onerous restrictions on the voter registration process, chilling political

2

participation and further burdening the abilities of lawful voters to cast their ballots and make their voices heard.

7.  Among other things, SB 1111:

    a.  Interferes with the basic freedom of political expression by prohibiting Texas voters from establishing residence for the purpose of influencing elections;

    b.  Restricts registration opportunities for Texans who have temporarily relocated by prohibiting voters from designating previous residences as their fixed places of habitation even if they consider those residences to be their homes; and

    c.  Burdens voters who rely on post offices boxes for their residences by conditioning their registration on the production of additional documentation.

8.  By prohibiting the establishment of residence to influence elections, SB 1111 intrudes upon the freedoms of speech and expression guaranteed to voters, volunteers, and political candidates by the First Amendment to the U.S. Constitution—and even creates the risk of *criminal prosecution* based on a vague, overbroad restriction.

9.  The new law will also have a particularly burdensome impact on college students and other young voters—a demographic group whose political participation is permanently changing the Lone Star State's electoral landscape—by preventing them, for instance, from registering at their prior home addresses when they relocate temporarily to attend school.

10.  And by injecting confusion and uncertainty into the registration process, SB 1111 injures organizations like Plaintiffs that devote time and resources to registering voters—including and especially young voters.

11.  SB 1111 is not justified by any compelling or even legitimate state interests. Instead, the bill is a solution in search of a problem, one that does not *solve* any issues—there is no evidence of fraud or other malfeasance that the bill could even conceivably remedy—but

3

instead only *creates* them, by violating the constitutional rights of lawful Texas voters and further restricting access to the franchise.

12.     Plaintiffs now bring this lawsuit to protect both their rights and the rights of their members and constituents secured by the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution, and to ensure equal access to the ballot box for all Texans.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

14.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States and involve the assertion of deprivations, under color of state law, of rights under the U.S. Constitution.

15.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred and will occur in this judicial district.

17.     This Court has the authority to enter declaratory judgment and provide injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

18.     Plaintiff Texas State LULAC is the Texas chapter of the League of United Latin American Citizens ("LULAC"), the oldest and largest Latino civil rights organization in the United States. LULAC is a nonprofit membership organization with a presence in most of the 50 states, including Texas. It was founded with the mission of protecting the civil rights of Latinos, including

voting rights. LULAC participates in civic engagement activities such as voter registration, voter education, and voter turnout efforts.

19.     Texas State LULAC was founded in 1929 and has more than 8,000 members across the State, including registered voters. Texas State LULAC regularly engages in voter registration, voter education, and other activities and programs designed to increase voter turnout among its members and their communities. These efforts are key to LULAC's mission of increasing civic participation among its members. Texas State LULAC commits time, personnel, and resources to these efforts throughout Texas. Texas State LULAC must divert substantial resources and attention from other critical missions to address the adverse impacts SB 1111 will have on its members and constituents and assist them in surmounting these new barriers to registration and voting. Because of SB 1111, Texas State LULAC and its members have suffered and will continue to suffer irreparable harm.

20.     Plaintiff Voto Latino brings this action on behalf of itself and its constituents and supporters. Voto Latino is a 501(c)(4) nonprofit, social welfare organization under the Internal Revenue Code that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinx voters are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle, including the nearly 5.6 million eligible Latinx voters in Texas. Voto Latino considers eligible Latinx voters in Texas to be the core of its constituency. Voto Latino mobilizes Latinx voters in Texas through statewide voter registration initiatives, as well as peer-to-peer and digital voter education and get-out-the-vote campaigns. In 2020 alone, Voto Latino registered 184,465 voters in Texas. In future elections, Voto Latino

anticipates making expenditures in the millions of dollars to educate, register, mobilize, and turn out Latinx voters across the United States, including in Texas.

21.     Voto Latino will have to expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states—and its other registration efforts in Texas—to combat SB 1111's effects on its core constituency, and to assist its constituents in navigating the various additional hurdles that impede access to the franchise and threaten to silence the voices of Latinx voters.

22.     Defendant Bruce Elfant is sued in his official capacity as the Travis County Tax Assessor-Collector. In this capacity, he serves as the voter registrar for Travis County. *See* Tex. Elec. Code § 12.001. The Travis County Tax Assessor-Collector is sued for the manner in which he implements the provisions of SB 1111 challenged in this action.

23.     Defendant Jacquelyn Callanen is sued in her official capacity as the Bexar County Elections Administrator. In this capacity, she serves as the voter registrar for Bexar County. *See id.* § 12.001. The Bexar County Elections Administrator is sued for the manner in which she implements the provisions of SB 1111 challenged in this action.

24.     Defendant Isabel Longoria is sued in her official capacity as the Harris County Elections Administrator. In this capacity, she serves as the voter registrar for Harris County. *See id.* § 12.001. The Harris County Elections Administrator is sued for the manner in which she implements the provisions of SB 1111 challenged in this action.

25.     Defendant Yvonne Ramón is sued in her official capacity as the Hidalgo County Elections Administrator. In this capacity, she serves as the voter registrar for Hidalgo County. *See id.* § 12.001. The Hidalgo County Elections Administrator is sued for the manner in which she implements the provisions of SB 1111 challenged in this action.

26.     Defendant Michael Scarpello is sued in his official capacity as the Dallas County Elections Administrator. In this capacity, he serves as the voter registrar for Dallas County. *See id.* § 12.001. The Dallas County Elections Administrator is sued for the manner in which he implements the provisions of SB 1111 challenged in this action.

27.     Defendant Lisa Wise is sued in her official capacity as the El Paso County Elections Administrator. In this capacity, she serves as the voter registrar for El Paso County. *See id.* § 12.001. The El Paso County Elections Administrator is sued for the manner in which she implements the provisions of SB 1111 challenged in this action.

## STATEMENT OF FACTS AND LAW

### I.     Changing Demographics of Texas Voters

28.     Despite the obstacles that Texas voters must regularly navigate simply to exercise their most fundamental democratic rights—obstacles made even more arduous by the unique and unprecedented challenges of the COVID-19 pandemic during the 2020 election—the most recent midterm and presidential elections resulted in the State's highest voter turnout in decades.

29.     As Republican lawmakers in the State are well aware, this increase in voter participation coincides with significant demographic shifts in Texas's eligible voting age population. According to U.S. Census estimates, the combined number of eligible Hispanic and Black voters in the State has been steadily rising, while the number of eligible non-Hispanic white voters has declined.

30.     In addition, as Republican governor Greg Abbott has repeatedly emphasized in public comments, people are moving to Texas from other states. In his 2019 State of the State Address, Governor Abbott pointed out that, every day, "about 1,000 new residents will call Texas home." And those new residents are disproportionately arriving from traditionally Democratic states.

31.     The largest number of new Texas residents comes from the Golden State, with over 700,000 Californians relocating to Texas since 2008. Hundreds of thousands more have moved from blue-hued states like New York and Illinois. And while Republicans like Governor Abbott have repeatedly tried to characterize these new Texans as conservative Americans "fed up with big government policies," the facts on the ground tell a different story.

32.     These new Texans are settling in and around the State's major urban centers like the Houston area and the Dallas-Fort Worth metroplex, making these areas politically competitive in a way that would have been impossible to imagine even a decade ago and transforming the State's electoral landscape.

33.     In 2018, Texas saw its highest voter turnout for a midterm election in over two decades. Democratic candidates defeated several high-profile Republican incumbents, flipped several competitive local offices, and picked up two seats in the U.S. House of Representatives, 12 seats in the Texas House of Representatives, and two seats in the Texas Senate. In addition to these significant electoral victories, Democrats in Texas fielded their first competitive U.S. Senate candidate in 30 years.

34.     Voter turnout increased again during the 2020 general election. Sixty-six percent of the State's 17 million registered voters cast ballots, an increase in turnout of almost 7 percent over 2016. This increase was driven by the rise in minority and urban voter participation.

35.     In response to the increase in voter turnout (and increased competitiveness of Democratic candidates across the State), Texas Republicans attempted to pass a host of sweeping voter suppression legislation during the recently concluded legislative session. While a burdensome omnibus bill ultimately failed at the eleventh hour, Texas Republicans were nevertheless successful in passing a number of other suppressive laws, including SB 1111.

II.     **Senate Bill 1111**

36.     SB 1111 imposes a series of vague, overbroad, and discriminatory residence requirements intended to restrict voter registration and participation.

A.     **The Residence Restriction**

37.     First, SB 1111 strikes the common-law definition of residence that previously governed the Election Code and, rather than articulate another affirmative definition of residence, forbids anyone from establishing a residence "for the purpose of influencing the outcome of a certain election" (the "Residence Restriction"). SB 1111 § 1 (amending Tex. Elec. Code § 1.015(b)).

38.     The Residence Restriction's vague prohibition discourages registration among new, politically active registrants—including young and minority voters and voters who have recently moved to Texas from other states.

39.     Under SB 1111, new registrants—or *any* voters who change their residences—who give consideration to where they might vote or who might represent them before moving to or within the State risk violating Texas law in order to exercise their most fundamental constitutional rights.

40.     Moreover, the Residence Restriction plainly applies not only to *voters* who establish residency for electoral purposes, but *candidates* as well.

41.     There is nothing sinister or unusual about candidates establishing residences in order to qualify for the ballot and thus influence the outcome of an election. Members of the Texas Legislature are required to be "resident[s] of the district[s] for which [they] shall be chosen" for at least one year prior to their elections. Tex. Const. art. III, §§ 6–7. And although the U.S. Constitution does not impose a residency requirement for members of the U.S. House of Representatives, many members nevertheless choose for political and other reasons to reside in

the districts they represent, thus requiring some members to establish new residences to run in different districts.

42.     To give but one example, incumbent Republican congressman Pete Sessions—who represented Texas's Fifth Congressional District from 1997 to 2003 and its Thirty-Second Congressional District from 2003 to 2019—moved from the Dallas area to Waco in order to mount his successful bid for the State's Seventeenth Congressional District in 2020.

43.     Such commonplace internal relocation, which can be expected following the upcoming redrawing of congressional and legislative boundaries as a result of Texas's constitutionally mandated reapportionment process, would be impermissible under the Residence Restriction.

44.     Campaign volunteers and other advocates who establish residence in the State to exercise their First Amendment rights in the electoral arena will similarly be placed at risk of liability due to the Residence Restriction.

**B.     Temporary Relocation**

45.     Next, SB 1111 provides that "[a] person may not establish a residence at any place the person has not inhabited" and further commands that "[a] person may not designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of designation and intends to remain." SB 1111 § 1 (adding Tex. Elec. Code § 1.015(f)).

46.     Consequently, college students and other Texans who have temporarily relocated— whether for educational, employment, or other reasons—cannot register using a home address that they do not actively "inhabit" when they register to vote, even if they consider that previous address to be their home. And because the Election Code already provides that "[a] person does not acquire a residence in a place to which the person has come *for temporary purposes only* and without the intention of making that place the person's home," Tex. Elec. Code § 1.015(d)

(emphasis added), voters who do not intend to remain in their temporary locations are seemingly precluded from registering to vote altogether.

47.     Moreover, neither SB 1111 nor the Election Code defines the phrases "home," "designate," or "intends to remain." And because SB 1111 has eliminated the common-law definition of residence, potential voters can no longer rely on previous interpretations of "residence" or what it meant to "intend to remain."

### C.     Post Office Boxes

48.     Finally, SB 1111 imposes onerous voter-identification requirements on registered voters who use post office boxes or similar locations to register to vote.

49.     If a registrar has reason to believe that a "voter's residence address is a commercial post office box or similar location that does not correspond to a residence," then the registrar *must* deliver a "written confirmation notice requesting confirmation of the voter's current residence." SB 1111 § 2 (amending Tex. Elec. Code § 15.051(a)).

50.     Upon receipt of such a notice, a registered voter must provide a photocopy of one of six documents containing the voter's residence address: a driver's license, a personal identification card, a license to carry a concealed handgun, an appraisal district document showing the voter's residence address, a utility bill showing the voter's residence address, or a tax document showing the registration address of a vehicle the voter owns. *Id.* §§ 4–5 (amending Tex. Elec. Code § 15.053(a) and adding Tex. Elec. Code § 15.054).

51.     SB 1111 does allow for a voter "whose residence in this state has no address" to document residence "by executing an affidavit stating that the voter's residence in this state has no address, providing a concise description of the location of the voter's residence, and delivering the affidavit to the registrar with the voter 's response to the confirmation notice." *Id.* § 5 (adding Tex. Elec. Code § 15.054(b)). But this applies only to voters (like homeless voters) whose

residences have no addresses—*not* generally to voters with addresses who simply lack the required documentation to confirm their residences.

## CLAIMS FOR RELIEF

### COUNT I

**U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983**
**Undue Burden on the Rights to Free Speech and Expression**
**Against All Defendants**

52.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

53.     "[T]he freedom of speech"—including "core political speech"—is "secured by the First Amendment against abridgment by the United States" and is "among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State." *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940)). This protection "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government," *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 604 (1982), and it prohibits the State "from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors*, 515 U.S. 819, 829 (1995).

54.     The U.S. Supreme Court has noted that "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders," which "[c]itizens can exercise" by not only voting, but also "run[ning] for office themselves." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (controlling op.).

55.     The Residence Restriction violates the free speech guarantees of the U.S. Constitution because it directly restricts voters', volunteers', and candidates' freedom of political expression. Voters cannot relocate to or within the State to effect political change; volunteers and

advocates cannot establish residence if they do so to promote a given candidate or issue; and candidates themselves cannot move or otherwise base their residence on their desire or ability to appear on the ballot.

56.     As an election law that "directly regulates core political speech," the Residence Restriction must satisfy strict scrutiny and "be narrowly tailored to serve a compelling governmental interest." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) (collecting cases).

57.     At the very least, the Residence Restriction constitutes a "limitation on political expression subject to exacting scrutiny," *Meyer*, 486 U.S. at 420, thus requiring "a 'substantial relation' between the [] requirement and a 'sufficiently important' governmental interest." *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976) (per curiam)).

58.     The Residence Restriction cannot survive strict or exacting scrutiny—or any level of scrutiny—because it is not fairly calculated to address even a legitimate governmental interest, let alone a compelling one.

59.     Furthermore, the Residence Restriction will chill constitutionally protected speech and expression because it is impermissibly vague and overbroad. *See Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 777 F.2d 1046, 1055 (5th Cir. 1985) (noting that "[i]njury to First Amendment rights may result" from laws that "chill . . . ardor and desire to engage in protected expression" (second alteration in original) (quoting *Spartacus Youth League v. Bd. of Trs.*, 502 F. Supp. 789, 796–97 (N.D. Ill. 1980))).

60.     The Residence Restriction provides that "[a] person may not establish residence for the purpose of influencing the outcome of a certain election." SB 1111 § 1. But it fails to provide

any guidance as to what "influencing the outcome" of an election means. The possibilities cover a range of constitutionally protected activity, from running for office and casting a ballot to commonplace election-related undertakings like door-knocking and one-on-one advocacy.

61.     Moreover, neither the Resident Restriction nor any other section of the Election Code clarifies what it means to "*establish* residence." And because SB 1111 removes the previous affirmative definition of "residence" that incorporated the common law, neither Plaintiffs nor their members or constituents can rely on precedent to inform their interpretation of this phrase.

62.     The risk of unconstitutional chilling is particularly pronounced because casting a ballot after registering to vote using an impermissible residence address might expose a voter to criminal liability. *See, e.g.*, Tex. Elec. Code § 64.012(a) ("A person commits an offense if the person . . . votes or attempts to vote in an election in which the person knows the person is not eligible to vote."); *Heath v. State*, No. 14-14-00532-CR, 2016 WL 2743192, at *1–2 (Tex. Ct. App. May 10, 2016) (affirming conviction where voter cast ballot after registering at address that did not qualify as proper residence under Election Code).

63.     In addition to chilling voter registration and political expression among Plaintiffs' members and constituents, the Residence Restriction will also chill Plaintiffs' *own* speech and advocacy. By adding confusion and the risk of criminal liability to the registration process, the Residence Restriction interferes with Plaintiffs' abilities to encourage and support voter registration—activity protected by the First Amendment. *See, e.g.*, *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006) ("[P]articipation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment. These rights belong to—and may be invoked by—not just the voters seeking to register, but by third

14

parties who encourage participation in the political process through increasing voter registration rolls." (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968))).

64.     Because the Residence Restriction constitutes a direct limitation on core political speech that is unjustified by a sufficient governmental interest, and because it will have the effect of chilling constitutionally protected activity due to its vagueness and overbreadth, it violates the First Amendment's guarantees of free speech and expression.

### COUNT II

**U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983**
**Undue Burden on the Right to Vote**
**Against All Defendants**

65.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

66.     Under the First and Fourteenth Amendments to the U.S. Constitution, a state cannot utilize election practices that unduly burden the right to vote.

67.     When addressing a challenge to a state election practice, a court balances the character and magnitude of the burden the practice causes on any First and Fourteenth Amendment rights the plaintiff seeks to vindicate against the justifications offered by the state in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

68.     "However slight th[e] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

69.     SB 1111 burdens voters, especially students and other transient voters, by unduly— and, in some cases, prohibitively—restricting the residences that they can claim when they register

to vote. A voter who has temporarily relocated cannot use either their current location *or* their previous address to register, even if they intend to return to their previous address in the future. Such voters are thus precluded from registering to vote. *See* Tex. Elec. Code § 15.001(a) ("Each voter registration certificate must contain . . . the voter's residence address . . . .").

70.     Moreover, SB 1111 burdens voters who rely on post office boxes for their voter registrations. These voters are required to produce corroborating documentation, thus imposing additional barriers on the franchise. And the right to vote for these voters who are unable to produce this documentation is abridged entirely.

71.     The ultimate goal of SB 1111 is to warp the electorate for partisan ends; the bill targets young and minority voters to silence their voices and ensure that their collective voting strength does not translate to political power or accountability.

72.     This is nothing new, particularly in Texas. Consistent with recent findings by courts that Texas lawmakers have repeatedly restricted access to the franchise as a shield against demographic and partisan changes in the state, *see, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 225, 234–43 (5th Cir. 2016) (en banc), SB 1111 constitutes yet another reprehensible continuation of these efforts.

73.     SB 1111 serves no legitimate, let alone any compelling, governmental interest. Consequently, the burdens it imposes on voters—including Plaintiffs' members and constituents—violate the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT III

**U.S. Const. Amend. XXVI; 42 U.S.C. § 1983**
**Denial or Abridgement of the Right to Vote on Account of Age**
**Against All Defendants**

74.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

75.     The Twenty-Sixth Amendment to the U.S. Constitution provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. It guarantees young, qualified voters a substantive right to participate equally with other qualified voters in the electoral process. Election laws, practices, and procedures designed to deny or abridge the right to vote because of age are thus unconstitutional. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 183–84 (5th Cir. 2020).

76.     "The legislative history preceding the adoption of the amendment clearly evidences the purpose not only of extending the voting right to younger voters but also of encouraging their participation by the elimination of all unnecessary burdens and barriers." *Worden v. Mercer Cnty. Bd. of Elections*, 294 A.2d 233, 237 (N.J. 1972). The Twenty-Sixth Amendment thus "nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise . . . although the abstract right to vote may remain unrestricted." *Jolicoeur v. Mihaly*, 488 P.2d 1, 4 (Cal. 1971) (alteration in original) (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)); *see also Tex. Democratic Party*, 978 F.3d at 191 ("We agree with *Jolicoeur* to the extent it means that a voting scheme that adds barriers primarily for younger voters constitutes an abridgement due to age.").

77.     While the Twenty-Sixth Amendment "speaks only to age discrimination, it has . . . particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973).

78.     By restricting registration opportunities for college students—including Plaintiffs' members and constituents—SB 1111 prevents newly enfranchised young Texans from effectively exercising their right to vote in violation of the Twenty-Sixth Amendment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a.    Declaring that SB 1111 violates the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution;

b.    Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to SB 1111;

c.    Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d.    Granting such other and further relief as the Court deems just and proper.

Dated: June 22, 2021.                    Respectfully submitted,

                                         /s/  John R. Hardin
                                         John R. Hardin
                                         Texas State Bar No. 24012784
                                         **PERKINS COIE LLP**
                                         500 North Akard Street, Suite 3300
                                         Dallas, Texas 75201-3347
                                         Telephone: (214) 965-7700
                                         Facsimile: (214) 965-7799
                                         johnhardin@perkinscoie.com

                                         Uzoma N. Nkwonta*
                                         Kathryn E. Yukevich*
                                         **PERKINS COIE LLP**
                                         700 Thirteenth Street NW, Suite 800
                                         Washington, D.C. 20005-3960
                                         Telephone: (202) 654-6200
                                         Facsimile: (202) 654-9996
                                         unkwonta@perkinscoie.com
                                         kyukevich@perkinscoie.com

                                         Jonathan P. Hawley*
                                         **PERKINS COIE LLP**
                                         1201 Third Avenue, Suite 4900
                                         Seattle, Washington 98101-3099
                                         Telephone: (206) 359-8000
                                         Facsimile: (206) 359-9000
                                         jhawley@perkinscoie.com

                                         *Counsel for Plaintiffs Texas State LULAC and
                                         Voto Latino*

                                         *Pro Hac Vice* Application Forthcoming

Domingo Garcia
Texas State Bar No. 07631950
**LAW OFFICE OF DOMINGO GARCIA PC**
1111 West Mockingbird Lane, Suite 1200
Dallas, Texas 75247-5012
Telephone: (214) 941-8300
dgarcia@lulac.org

Luis Roberto Vera, Jr.
Texas State Bar No. 29546740
**ATTORNEY AND COUNSELOR AT LAW**
407 West Ware Boulevard
San Antonio, Texas 78221
Telephone: (210) 225-3300
lrvlaw@sbcglobal.net

*Counsel for Plaintiff Texas State LULAC*