## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| TEXAS STATE LULAC;<br>VOTO LATINO,<br><br>                 Plaintiffs,<br><br>    v.<br><br>BRUCE ELFANT, in his official capacity as the<br>Travis County Tax Assessor-Collector;<br>JACQUELYN CALLANEN, in her official<br>capacity as the Bexar County Elections<br>Administrator; ISABEL LONGORIA, in her<br>official capacity as the Harris County Elections<br>Administrator; YVONNE RAMÓN, in her official<br>capacity as the Hidalgo County Elections<br>Administrator; MICHAEL SCARPELLO, in his<br>official capacity as the Dallas County Elections<br>Administrator; LISA WISE, in her official capacity<br>as the El Paso County Elections Administrator,<br><br>                 Defendants,<br>  and<br><br>KEN PAXTON, in his official capacity as<br>Attorney General of Texas; LUPE TORRES, in<br>their official capacity as Medina County Election<br>Administrator; TERRIE PENDLEY, in her official<br>capacity as the Real County Tax-Assessor<br>Collector,<br><br>             Intervenor-Defendants. | Case No. 1:21-cv-00546-LY |

## PLAINTIFFS' RESPONSE TO DEFENDANT-INTERVENOR KEN PAXTON'S
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 4

I. Plaintiffs have standing to assert claims on their behalf, and on behalf
of the voters they represent. ........................................................................................ 4

A. Plaintiffs have Article III standing. ...................................................................... 4

B. Plaintiffs have statutory standing. ........................................................................ 8

II. The Residence Restriction violates the First Amendment. ......................................... 9

III. SB 1111 unduly burdens the right to vote. ................................................................. 13

A. The Residence Restriction unduly burdens the right to vote. ............................. 13

B. The Temporary Relocation Provision unduly burdens the right to vote. ............ 15

C. The PO Box Provision unduly burdens the right to vote. ................................... 16

IV. SB 1111 violates the Twenty-Sixth Amendment. ..................................................... 18

CONCLUSION ....................................................................................................................... 20

# TABLE OF POINTS AND AUTHORITIES

**Page(s)**

**Cases**

*Alamo Forensic Servs., LLC v. Bexar Cnty.*,
  861 Fed. App'x 564 (5th Cir. 2021) ........................................................6

*Am. Ass'n of People with Disabilities v. Herrera*,
  690 F. Supp. 2d 1183 (D.N.M. 2010) ....................................................12

*Am. Ass'n of People with Disabilities v. Herrera*,
  No. CIV 08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010) ..............12

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) .................................................................9

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)..............................................................................5

*Buckley v. Am. Const. Law Found.*,
  525 U.S. 182 (1999) (Thomas, J., concurring) ........................................12

*Burdick v. Takushi*,
  503 U.S. 428 (1992)........................................................................15, 19

*Carrington v. Rash*,
  380 U.S. 89 (1965)..............................................................................14

*Church of Scientology of Cal. v. Cazares*,
  638 F.2d 1272 (5th Cir. 1972) ...............................................................9

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
  2 F.3d 1514 (11th Cir. 1993) .................................................................8

*Excell Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat. Ass'n*,
  758 F.3d 592 (5th Cir. 2014) .................................................................9

*Exodus Refugee Immigr., Inc. v. Pence*,
  165 F. Supp. 3d 718 (S.D. Ind. 2016) .....................................................7

*Exodus Refugee Immigr., Inc. v. Pence*,
  838 F.3d 902 (7th Cir. 2016) .................................................................7

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
  347 F. Supp. 3d 1251 (N.D. Ga. 2018).....................................................9

*Guild v. Securus Techs. Inc.*,
   2015 WL 10818584 (W.D. Tex. Feb. 4, 2015)........................................................6

*Hutchins by Owens v. District of Columbia*,
   188 F.3d 531 (D.C. Cir. 1999)..............................................................................7

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.*,
   749 F. Supp. 2d 486 (N.D. Tex. 2010) ................................................................9

*Jackson v. Dukakis*,
   526 F.2d 64 (1st Cir. 1975)..................................................................................8

*Jackson v. Sargent*,
   394 F. Supp. 162 (D. Mass. 1975) .......................................................................8

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972).............................................................................................5

*League of Women Voters of Fla. v. Cobb*,
   447 F. Supp. 2d 1314 (S.D. Fla. 2006) ...............................................................12

*Lewis v. Hughs*,
   475 F. Supp. 3d 597 (W.D. Tex. 2020).................................................................9

*Lewis v. Scott*,
   28 F.4th 659 (5th Cir. 2022) ................................................................................9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014).............................................................................................8

*Luft v. Evers*,
   963 F.3d 665 (7th Cir. 2020) .............................................................................19

*NAACP v. Alabama*,
   357 U.S. 449 (1958).............................................................................................5

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
   280 F.3d 278 (3d Cir. 2002)................................................................................7

*Payne-Barahona v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007)....................................................................................7

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009).............................................................................................5

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014).............................................................................................5

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ..........................................................................18, 19

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ..........................................................................11, 12

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973)....................................................................................19

**Statutes**

42 U.S.C. § 1983 ...........................................................................................................8, 9

Tex. Elec. Code § 1.015(a) .........................................................................................10, 14

Tex. Elec. Code § 1.015(b) ...............................................................................2, 10, 11, 12

Tex. Elec. Code § 1.015(d) ...............................................................................................15

Tex. Elec. Code § 1.015(f) ...........................................................................................2, 15

Tex. Elec. Code § 13.007...................................................................................................20

Tex. Elec. Code § 15.051(a) ........................................................................................13, 17

**Other Authorities**

SB 1111, 87th Leg. Reg. Sess. (Tex. 2021)..............................................................1, 3, 17

U.S. Const. amend. XXVI, § 1 ..........................................................................................18

## INTRODUCTION

Senate Bill 1111 ("SB 1111") enacts three major changes to the Texas Election Code that make it harder for qualified Texas voters to register to vote where they live. Plaintiffs' motion for summary judgment set out why these suppressive provisions run afoul of numerous constitutional guarantees, including the First Amendment's promise of the right to free speech and association; the First and Fourteenth Amendment's protection of the right to vote; and the Twenty-Sixth Amendment's guarantee that voting rights will not be denied or abridged on account of age. *See* Pls.' Mot. for Summ. J. and Mem. of Law in Supp., ECF No. 140 ("Pls.' MSJ").

Defendant-Intervenor Ken Paxton's competing motion for summary judgment has precious little to say about the constitutionality of the suppressive provisions at issue. *See* Def.-Intervenor Ken Paxton's Mot. for Summ. J., ECF No. 138 ("State's MSJ").[1] Instead, the State primarily argues that Plaintiffs Texas State LULAC ("LULAC") and Voto Latino lack standing to challenge SB 1111. That is wrong. The State's motion ignores undisputed evidence that Plaintiffs have been required to divert resources from other programming to contend with SB 1111's suppressive effects in Texas and, also, that each organization has been chilled in its communication with members and potential registrants. Those harms inflicted by SB 1111 are more than sufficient for Plaintiffs to establish organizational standing. LULAC also independently has associational standing because all of its members have been harmed—SB 1111 chills LULAC's ability to speak to, advise, or even assist its members with voter registration, violating the members' rights to hear and receive this information.

---

[1] Two county officials who also intervened in this case as defendants join the State's motion, but do not offer any separate arguments in support of it. *See generally* Intervenor-Defs. Torres and Pendley's Notice of Joinder, ECF No. 139.

On the merits, the State presents only thin arguments in support of the law, none of which can withstand scrutiny. Section 1.015(b) of the Texas Election Code bars would-be voters from "establish[ing] residence" in a Texas county "for the purpose of influencing the outcome of a certain election." Tex. Elec. Code § 1.015(b) ("Residence Restriction"). It therefore disenfranchises voters who move within Texas with the intent to establish residence if they do so to engage in constitutionally-protected activity, like registering to vote, running for office, or volunteering on a campaign. The State's only defense of the Residence Restriction is to say that it applies solely to individuals trying to fraudulently register where they do not actually live. That badly misreads the relevant statutory text and, unsurprisingly, nearly every County Defendant made clear that they understand the law to apply even to individuals seeking to establish a *bona fide* residence in a Texas county. The State may not jerry-rig an implausible and post-hoc interpretation to remedy the Residence Restriction's facial unconstitutionality. Such blatant misreading of the statutory text does nothing to remedy the chilled speech suffered by those who fall, or may fall, within the law's true ambit.

The second provision at issue, Texas Election Code § 1.015(f) ("Temporary Relocation Provision"), provides that a person "may not designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of designation and intends to remain." *Id.* § 1.015(f). In other words, Texans may not register at an address they do not "inhabit[]" and "intend[] to remain" at "at the time" they register. That bars Texans temporarily away from a family residence for school or work from registering at their home because do not "inhabit" it when they register. And because existing Texas law bars would-be voters from registering at an address they are at only temporarily, such as a dormitory or short-term work detail, many are left without *any* appropriate address for registration. The State's sole defense, again, is

to misread the plain text of the statute and insist that voters may also register wherever they live. But that ignores that many registrants now *cannot* register at what they consider their true home— because they do not presently inhabit it and intend to remain at it—*or* at the temporary quarters they currently occupy. The State's bare and unsupported insistence to the contrary offers cold comfort to voters who must navigate this contradictory legal thicket. And it again offers no remedy to organizations like Plaintiffs, who are chilled in their ability to advise potential registrants on how to register without violating Texas law.

Finally, SB 1111 imposes an arbitrary and burdensome process on how some voters update their residential address. SB 1111 §§ 2-5 ("PO Box Provision"). The State insists this burden is justified by its need to ensure people vote where they live. But even if this were a real issue in Texas (and it is not) the State fails to explain why that interest supports requiring only *some* voters, but not others, to supply proof of residence when providing similar residential information to registrars. No such interest exists. Existing Texas law already barred people from registering at non-residential addresses and the PO Box Provision burdens voters making good faith efforts to correct their registrations but does nothing to impede any hypothetical bad actor trying to register fraudulently.

Because the State has failed to show through undisputed material that Plaintiffs lack standing, or that any of the suppressive provisions at issue are constitutional, its motion must be denied.

**ARGUMENT**

I.   **Plaintiffs have standing to assert claims on their behalf, and on behalf of the voters they represent.**

    A.   **Plaintiffs have Article III standing.**

Plaintiffs LULAC and Voto Latino have Article III standing because SB 1111 injures them directly. SB 1111 forces Plaintiffs to divert resources from their usual activities to attempt to ameliorate the statute's harm to their respective missions. *See* LULAC Tr. 72:11-73:5 (App. 113-14); Voto Latino Tr. 90:12-17 (App. 098); *id.* at 106:22-107:19 (App. 099-100); Pls.' MSJ at 33-34. The State ignores this evidence of the Plaintiffs' diverted resources altogether. Instead, it contends that LULAC "disclaimed any assertion of organizational standing" in its Rule 30(b)(6) deposition. Not so. Plaintiffs alleged LULAC's organizational standing in the complaint, *see* Compl. ¶ 20; *see also* Pls.' MSJ at 31-34, and LULAC's 30(b)(6) deponent repeatedly testified that SB 1111 injured the organization directly. LULAC Tr. 31:14-32:4 (App. 106-07) (discussing chilling effect on LULAC's voter registration efforts); *id.* at 72:11-73:5 (App. 113-14) (discussing diversion of resources injury).  As to Voto Latino, the State raises no argument at all that the organization lacks standing due to its diversion of resources. *See* State's MSJ at 7-8.

The State also challenges LULAC's assertion of an organizational injury from the chilling effect that SB 1111 has on its voter registration efforts. *See* State's MSJ at 7; *but see* Pls.' MSJ at 31-32. Although the State admits that this "chilling, if established factually, could satisfy organizational standing," State's MSJ at 7, it claims the injury has not been established here because "LULAC did not sue any of the prosecutors in Texas who could have actually prosecuted them" and "[t]here is no factual allegation that any of the county-level elections administrators are intent on prosecuting LULAC." *Id.* But the State's argument misses a crucial factual detail: The County Defendants directly chill LULAC's protected activity because they process voter

4

registration applications and are required to notify law enforcement if they become aware of unlawful voter registration. *See* Pls.' MSJ at 38 (citing Eldred Tr. 196:1-6; Tex. Elec. Code § 15.028). The chilling injury is traceable to this conduct by the County Defendants, and LULAC need not separately sue local prosecutors to establish Article III standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 153, 159-61 (2014) (finding plaintiff had standing to bring First Amendment claim against Ohio Election Commission over Ohio statute prohibiting "false statements" during political campaigns due to chilling effect of threat of criminal prosecution, where Commission was obligated to "refer" violations "to the relevant county prosecutor" and no prosecutors were named as defendants).[2]

The State's contention that LULAC lacks associational standing because it has not identified any specific injured members is also misguided. State's MSJ at 8. The "requirement of naming the affected members" is "dispensed with . . . where all the members of the organization are affected by the challenged activity." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009); *see also NAACP v. Alabama*, 357 U.S. 449, 459 (1958) (all organization members affected by release of membership lists). Here, all LULAC members in Texas are harmed by SB 1111, which chills the ability of the organization to speak with its members about various aspects of voter registration. *See* LULAC Tr. 28:19-30:13 (App. 103-05); *id* at 31:14-32:4 (App. 106-07). The Supreme Court has explained that it is "well established that the Constitution protects the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (collecting cases and explaining history of this right); *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (similar). LULAC's members participate in

---

[2] Voto Latino also has organizational standing because of the chill SB 1111 imposes upon it. *See, e.g.*, Voto Latino Tr. 51:3-24 (App. 089); *id*. at 70:3-7 (App. 095); *id.* at 106:22-107:19 (App. 099-100). The State's motion raises no argument to the contrary.

"activities such as voter registration, voter education, and voter turnout efforts," and receive messages from LULAC encouraging and instructing members on how to engage in these activities. Compl. ¶ 18. SB 1111 therefore chills all LULAC members from conducting activities that are central to the mission of the group that they belong to, and from receiving information and ideas that may violate SB 1111's sweeping, vague restrictions.[3]

Members aside, both LULAC *and* Voto Latino satisfy the requirements for third-party standing to bring these claims on behalf of Latinos who will be affected by SB 1111 when they register to vote or move to a new residence, especially those under the age of 18. A litigant has third-party standing to sue on behalf of another individual if: "(1) the litigant has suffered an injury-in-fact giving the litigant a sufficiently concrete interest in the outcome of the issue; (2) the litigant has a close relationship with the third party on whose behalf the right is asserted; and (3) there is a genuine obstacle to the third-party's ability to protect his own interests." *Guild v. Securus Techs. Inc.*, No. 1:14-CV-366-LY, 2015 WL 10818584, at *7 (W.D. Tex. Feb. 4, 2015) (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). For the reasons already discussed, both LULAC and Voto Latino have suffered injuries in fact that give them a concrete interest in the outcome of the issue.

Both also have "a close relationship to the third part[ies], such that the parties' interests are aligned." *Alamo Forensic Servs., LLC v. Bexar Cnty.*, 861 Fed. App'x 564, 569 (5th Cir. 2021). Each organization, for instance, is dedicated to protecting the voting rights of Latinos within and outside the state, including students, young people, and other prospective voters who are not yet eligible to vote in Texas. The President of Voto Latino testified that SB 1111 is "targeted at young

---

[3] Beyond these harms to *all* LULAC members, SB 1111 also acutely harms discrete groups. LULAC's 30(b)(6) deponent testified that the organization has more than 500 youth members, all of whom will be injured by SB 1111 when they become eligible to register to vote. LULAC Tr. 31:5-13 (App. 106).

voters as [a] whole, but in particular young Latinos," and that Voto Latino is "doing [its] darndest trying to explain things" to the "Latino youth" in particular. *See* Voto Latino Tr. at 160:5-163:4 (Suppl. App. 007-10); *see also id.* at 26:8-17 (App. 086); *id.* at 80:8-18 (Suppl. App. 006); *id.* at 169:16-25 (Suppl. App. 011).  LULAC's President likewise testified to the significant funds the organization plans to spend "to deal with the issues and the residency requirements and advising [Latino] students . . . in the state of Texas" due to SB 1111. LULAC Tr. 28:19-30:13 (App. 103-05); *see also id.* at 14:14-23 (App. 102); *id.* at 31:2-32:9 (App. 106-07) (describing LULAC's work with its younger members and collegiate counsels). Both organizations therefore have a close relationship with Latino voters and youth who are (or will be) harmed by SB 1111. *See, e.g.*, *Exodus Refugee Immigr.*, *Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016) (finding that organization "certainly ha[d] a close relationship" with refugee population it served because "[i]ts entire purpose and mission [was] to resettle refugees escaping dire circumstances"), *aff'd*, 838 F.3d 902 (7th Cir. 2016); *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, *Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (finding third-party standing for psychiatric organization bringing claims on behalf of individuals receiving mental health services).

Finally, there are genuine obstacles for many of these voters, particularly younger Texans and other prospective registrants who LULAC and Voto Latino serve, in vindicating their voting rights independently through litigation. Courts have held that it is "rather obvious" that minors are hindered in their ability to protect their own interests, so as to warrant third parties suing on their behalf. *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007); *Hutchins by Owens v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999). And voters who have recently moved or plan to move may not be aware of the vague and unlawful restrictions in SB 1111 until they attempt to register to vote or update their registration address—at which point it may be too late to vindicate their

constitutional rights in time to vote. Both Plaintiffs therefore meet the standard for asserting claims on behalf of these Texans.

### B.      Plaintiffs have statutory standing.

The State disregards binding precedent in arguing that Plaintiffs lack standing to bring claims under 42 U.S.C. § 1983 because, as "third parties," they do not possess a constitutional right to vote. *See* State's MSJ at 9. That is not the law. The statutory standing inquiry asks courts "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). This test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* at 130 (internal quotations omitted). And "the [Supreme] Court's precedents show that the zone of interests analysis under § 1983 is limited to ascertaining whether the substantive constitutional or statutory provision confers rights intended by the legislature to be enforceable under the remedial statute." *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1526 (11th Cir. 1993) (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992) (Scalia, J., concurring)).

The deprivation of rights alleged by LULAC and Voto Latino are those guaranteed by the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution, which are self-evidently within the zone of interests encompassed by § 1983, which protects against "deprivations of any rights . . . secured by the Constitution." 42 U.S.C. § 1983; *see also Jackson v. Sargent*, 394 F. Supp. 162, 167-68 (D. Mass. 1975) ("[I]t seems evident that, when state action is alleged, the zone of interests protected by this statute is coextensive with the zone of interests protected by the Constitutional right allegedly violated."), *aff'd sub nom. Jackson v. Dukakis*, 526 F.2d 64 (1st Cir. 1975). Courts have therefore repeatedly held that organizational plaintiffs can assert § 1983 claims

in their own right, because an organization's direct injury vis-à-vis its frustration of mission and diversion of resources due to an unconstitutional law is *not* a third-party claim. *See*, *e.g.*, *Lewis v. Hughs*, 475 F. Supp. 3d 597, 613 & *n.2 (W.D. Tex. 2020) (rejecting argument to the contrary from the Texas Secretary of State), *rev'd on other grounds sub nom. Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022) (reversing denial of motion to dismiss on sovereign immunity grounds); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018); *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.*, 749 F. Supp. 2d 486, 496 (N.D. Tex. 2010). Even if it were, Plaintiffs have third-party standing to bring such a claim for the reasons discussed above. *See supra* 6-8. And because Plaintiffs assert their own causes of action under § 1983, courts may not—as the State suggests—dismiss those claims for "prudential" reasons. *See Excell Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat. Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014) ("A court cannot limit a cause of action merely because 'prudence' dictates." (quoting *Lexmark*, 572 U.S. 118 at 128)) (cleaned up).

The same is true for associational standing. The Fifth Circuit has recognized that organizational plaintiffs with associational standing may assert § 1983 claims on behalf of their members. *See Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (nonprofit had associational standing to assert § 1983 claims on members' behalf); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1278–79 (5th Cir. 1972) (church had associational standing to assert § 1983 claims on members' behalf). Plaintiffs, thus, have properly asserted claims under § 1983 on their own behalf and on behalf of the individuals they serve.

## II.   The Residence Restriction violates the First Amendment.

The State asserts that it is entitled to summary judgment on Plaintiffs' First Amendment claim based on a post hoc and nonsensical rewriting of the Residence Restriction. The State disputes Plaintiffs' contention that the Residence Restriction regulates the reasons a person may

establish residence in Texas, and insists the statute merely prohibits a person from establishing residence at an "impossible address"—*i.e.*, a non-residential address where the person does not live. State's MSJ at 10-11. Even if it were not a made-for-litigation interpretation, the State's position is directly contrary to the plain language of the statute and the understanding of county elections administrators responsible for enforcing it.

The Residence Restriction plainly regulates a person's motivation for establishing residence in Texas. That much is clear even when one reads it "in context" with the definition of "residence" in subpart (a) as the State insists. *See* State's MSJ at 10. The Residence Restriction provides that a person "may not establish *residence* for the purpose of influencing the outcome of a certain election," Tex. Elec. Code § 1.015(b) (emphasis added), and subpart (a) provides that "residence" means "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence." *Id.* § 1.105(a). Reading subparts (a) and (b) in combination only confirms Plaintiffs' interpretation: "A person may not establish *domicile—that is, one's home and fixed place of habitation to which one intends to return after any temporary absence—for the purpose of influencing the outcome of a certain election.*" Tex. Elec. Code §§ 1.015(a), (b). The State's insistence that the Court should read the two sections in tandem makes clear what is constitutionally pernicious about the Residence Restriction: it prohibits a person from registering to vote *at their actual residence* if they moved to such a domicile "for the purpose of influencing the outcome of a certain election." *Id.* The State identifies no statutory language limiting the scope of the Residence Restriction to "impossible addresses." There is none.

The State's insistence that the Residence Restriction does not regulate speech also finds no support in the record. For one thing, the County Defendants—the parties responsible for administering the Residence Restriction—confirmed Plaintiffs' interpretation in their deposition

testimony. *E.g.*, Wise Tr. 92:22-93:3 (App. 190-91) ("establish residence" means "to inhabit a location based on the definition of Section A" of Section 1.105); Scarpello Tr. 61:18-19 (App. 172) (term refers to "the plain language found under the definition of 'residence' in the code"); *see also* Pls.' MSJ at 17-18 (collecting testimony).[4] For another, the Secretary's designee admitted the Residence Restriction could have been drafted to reflect the meaning the State insists it carries now. *See* Ingram Tr. 101:17-102:2 (App. 241-42). ("Q. Do you think the Texas legislature could have drafted Subsection (b) to say, A person may not establish residence at a place that is *not their residence* for the purpose of influencing the outcome of a certain election? A. They could have." (emphasis added)).

The Residence Restriction plainly prohibits a person from establishing residence in Texas for a particular reason: "for the purpose of influencing the outcome of a certain election." Tex. Elec. Code § 1.015(b). By its terms, the provision prohibits acts intended to influence the outcome an election, which includes activities like voting, running for office, and donating to and volunteering for political campaigns. *See* Pls.' MSJ at 10-11 (collecting testimony). The Fifth Circuit has recognized that these activities have sufficient "communicative elements" to be protected by the First Amendment. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). In *Steen*, the court explained that "voter registration drives involve core protected speech" including "'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to

---

[4] Even the two County Intervenor-Defendants who joined the State's motion agreed that the Residence Restriction can only be understood as regulating a person's ability to establish residence *where they actually live*. *See* Torres Tr. 44:22-45:1 (App. 225-226) ("establish residence" means "that they reside in – at the residence"); Pendley Tr. 36:18-19 (App. 218) ("Establish residence means your residence, where you live at[.]").

fill out their forms; and 'asking' for information to verify that registrations were processed successfully." *Id.* at 389-90. Other courts have found the same.[5]

Section 1.015(b) regulates expressive conduct in a more direct manner than in *Steen*, which concerned the delivery of completed voter registration applications. *See id.* at 390 (explaining statute regulated non-expressive conduct because it "*follows* the voter's completion of the application but is not itself 'speech'" (emphasis in original)). Unlike the law in *Steen*, which did not "restrict or regulate who can advocate pro-voter registration messages, the manner in which they may do so, or any communicative conduct," *id.* at 391, the Residence Restriction limits who may vote based on their expression of a political message. *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring). And, as explained, the Residence Restriction further impairs the expressive conduct of organizations like Voto Latino and LULAC, which are now burdened by the restriction in how they advise people to register to vote, and how they conduct voter registration activities in Texas. *See supra* 4-5; *see also* Pls.' MSJ at 20, 31-32.

The State's contention that the Residence Restriction does not regulate protected speech is accordingly meritless. And as discussed more fully in Plaintiffs' motion for summary judgment, SB 1111 imposes a content-based restriction on core political speech that fails to satisfy strict scrutiny. *See id.* at 14-19.

---

[5] *See, e.g.*, *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1215–16 (D.N.M. 2010) ("public endeavors to assist people with voter registration are intended to convey a message that voting is important, that the Plaintiffs believe in civic participation, and that the Plaintiffs are willing to expend the resources to broaden the electorate to include allegedly under-served communities," and thus is expressive conduct which implicates the First Amendment), *recons. on separate grounds*, No. CIV 08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) (finding "the collection and submission of voter registration drives is intertwined with speech and association" and is thus expressive conduct protected by the First Amendment).

**III.     SB 1111 unduly burdens the right to vote.**

The State's motion does little to justify the undue burdens that SB 1111's suppressive provisions place upon Texas voters. *See id.* at 20-28 (setting out burden and lack of state interest); *see also* State's MSJ at 13-16 (setting out the state's interests and alleged lack of burden). The State's motion acknowledges that Plaintiffs' second claim challenges all three suppressive provisions in SB 1. *See* State's MSJ at 14 ("Plaintiffs have challenged in their second count, §§ 1.015(b) and (f) . . . and § 15.051(a)"). Yet its own motion addresses only the third provision—the PO Box Provision—and fails to dispute that the Residence Restriction and Temporary Relocation Provision burden Texas voters. That omission is telling and undisputed evidence proves that those provisions *do* burden Texas voters. The State has therefore plainly failed to present undisputed material facts establishing that the suppressive provisions in SB 1111 are not unduly burdensome. Accordingly, its motion for summary judgment on Count II of the complaint must be denied.

**A.     The Residence Restriction unduly burdens the right to vote.**

The Residence Restriction prohibits voters in Texas from establishing residence to engage in constitutionally-protected activities like voting, running for office, and donating to and volunteering for political campaigns. *See supra* 9-12; Pls.' MSJ at 10-13. And it is drafted in such a manner that no reasonable person subject to the provision can be expected to discern what specific conduct is, or is not, prohibited. *See* Pls.' MSJ at 13-20 (collecting testimony). Indeed, county officials tasked with determining a registrants' eligibility to vote under the Texas Election Code could not clearly explain what the term "influencing the outcome of an election" means. Pls.' MSJ at 15-17 (collecting testimony). Rather than clarify the matter, the Secretary's office has declined to issue guidance or definitions that might explain the Residence Restriction's reach, choosing instead to adopt an implausible reading of the provision that contradicts what county officials believe the restriction to mean. *Id.* at 17-18. The law's vagueness chills not only potential

registrants in Texas who wish to engage in protected speech—it has *already* chilled Plaintiffs' ability to communicate with, and advise, would-be voters. *See* Voto Latino Tr. 51:3-24 (App. 089); *see also id*. at 70:3-9 (App. 095); LULAC Tr. 28:19-30:13 (App. 103-05); *id.* at 31:14-32:4 (App. 106-07).

The State's motion is silent as to these burdens imposed by the Residence Restriction. Instead (in addressing Plaintiffs' First Amendment claim) the State suggests that the Residence Restriction is harmless and only regulates individuals seeking to fraudulently register to vote at places they do not live. *See* State's MSJ at 11-12. But as explained, the State's implausible interpretation is a feint to avoid having to defend the constitutional merits of the Texas Election Code as written. *See supra* 9-11. The fact that the County Defendants—the authorities responsible for reviewing voter registration applications—understand the Residence Restriction applies to a person's *bona fide* domicile establishes the severe burden this law places on actual would-be voters. *Id.*

The State's failure to dispute that the Residence Restriction imposes a burden on Texas voters is sufficient to deny its motion for summary judgment on Count II. But it likewise fails to identify any state interest associated with that provision. The State's motion suggests it has an interest in "making sure that people vote where they live." State's MSJ at 14. But the law already required that. *See* Tex. Elec. Code § 1.015(a); *see also* Ingram Tr. 101:17-102:4 (App. 241-42). The Residence Restriction merely punishes politically-minded individuals who try to register to vote where they *do* live. *cf. Carrington v. Rash*, 380 U.S. 89, 94 (1965) (finding unconstitutional a Texas law that barred military voters from voting in Texas if they moved to Texas for purposes of military service). For that same reason, the State's proffer that it has an interest in "preventing fraud and promoting uniformity" has no bearing on the Residence Restriction. *See* State's MSJ at

14

14. The absence of a sufficiently weighty interest advanced by the Residence Restriction is all the more glaring because, as a severe restriction on the right to vote, the provision is subject to strict scrutiny and must be narrowly tailored to advance a compelling state interest. *See Burdick v. Takushi*, 503 U.S. 428, 434 (1992). The State's motion falls well short of meeting this standard.

### B.      The Temporary Relocation Provision unduly burdens the right to vote.

The State's motion is silent as to the burden that the Temporary Relocation Provision imposes on Texans who move away from their residence to a place they do not intend to remain indefinitely, such as school or a short-term work assignment. These individuals cannot designate their actual residence as their home because, while they are temporarily away from it, their home is not the place they "inhabit[] . . . at the time of designation." Tex. Elec. Code § 1.015(f). Nor can they "intend[] to remain" at the *bona fide* residence they are temporarily away from. *Id.* But by the same token, these voters cannot list their present, temporary address because Texas law already bars registering where a person "has come for temporary purposes only and without the intention of making that place [their] home." Tex. Elec. Code § 1.015(d). Plaintiffs introduced unrebutted expert testimony explaining why Texas's college students in particular are likely to be burdened when registering to vote, or barred from voting altogether, by these provisions. *See* Holbein Rep. at 43 (App. 069). That expert finding was buttressed by testimony from numerous County Defendants admitting that the provision complicates voter registration for college students. *See* Pls.' MSJ at 23-24 (collecting testimony). The burden imposed by the Temporary Relocation Provision on these would-be voters is further exacerbated by the chill the law places upon groups, like Plaintiffs, that seek to educate students about how they can register to vote. *See* Voto Latino Tr. 26:8-12 (App. 086); *id.* at 52:2-7 (App. 090); *id.* at 79:9-12 (App. 097); LULAC Tr. 14:12-18 (App. 102); *see also* LULAC Tr. 28:19-30:13 (App. 103-05) (explaining the additional resources LULAC must expend to help college-age students register). Once again, the State's silence as to

these burdens precludes any grant of summary judgment on its motion as to Count II. *See* State's MSJ at 15-16.

To be sure, the State's previously asserted interest in having voters identify where they live would not justify the Temporary Relocation Provision either. *See id.* at 15. The law's sweeping restrictions preclude certain Texas voters from registering at *any* address, whether it be their actual residence that they are temporarily away from, or the temporary residence they inhabit when they try to register. Likewise, the State's purported interest in "preventing fraud and promoting uniformity," *id.* at 14-15, cannot justify a law that leaves some qualified voters with no identifiable residence that would meet the registration requirements. *See id.* at 10-11. In other words, what little evidence of fraud in Texas elections that exists has *nothing* to do with the Temporary Relocation Provision.

### C.      The PO Box Provision unduly burdens the right to vote.

The State's brief discussion of PO Box Provision does little to refute or provide justification for the undue burden placed on voters. Its argument amounts to the bare assertion that being required to "provide documentary proof" that a registrant's address is actually a residence is not burdensome. *See id.* at 15-16. But as the State concedes, Texas law already required that applicants "register where [they] live." *Id.* at 15 (noting the "same requirement . . . existed before SB 1111"). Prior to SB 1111, a registrant in Texas could cure registering at non-residential address by simply filling out a standard confirmation form with an actual residence address. Ingram Tr. 205:17-207:6 (App. 257-59). That option is no longer available to Texas voters, who instead must now complete a separate voter confirmation form; supply documentary proof of residence (or claim an exemption); and sign the form with a wet signature. *Id.* at 217:3-218:17 (App. 263-64).

Nor is the burden of the documentary proof requirement justified by the State's interest "in making sure that people vote where they live." State's MSJ at 14. Here, the State's rationale is

16

undermined by the fact that Texas law already required voter registrars to send confirmation notices to voters whose listed address did not appear to reflect their actual current residence, *see* Tex. Elec. Code § 15.051(a), including voters whose registration addresses appeared to be non-residences. *See* Ingram. Tr. 205:17-207:6 (App. 257-59). Even before SB 1111, voters were "not allowed to . . . have a commercial post office box or [] similar" listed on their registrations and would be provided a "notice of incomplete" if they sought to do so. Torres Tr. 80:4-12 (Suppl. App. 002). As Lupe Torres, the registrar for Medina County explained, "that's been [the law] a while." Torres Tr. 80:22-81:7 (Suppl. App. 002-03).

The new law simply requires some, but not all, Texans to provide proof of their residence. *See* SB 1111 §§ 2-5 (App. 001-05). A voter who entered their address incorrectly or who wishes to change their address, for instance, need only submit a standard form. But if a registrant's address appears to be a "commercial post office box or similar location that does not correspond to a residence," SB 1111 § 2 (App. 001-002) (amending Tex. Elec. Code § 15.051(a)), they are now sent a distinct confirmation notice form that requires that they present documentary proof of residence or claim an exemption. Indeed, the Secretary of State's designee admitted that he did not "know why we can't use [the new Form 17-4] as a change of address form," and suggested that if the voter is "not still claiming to live at the [commercial post office box or the like], then . . . we should maybe use this as a change of address form . . ." Ingram Tr. at 221:4-224:2 (App. 265-68). In other words, even the Secretary cannot explain the arbitrary distinction that requires only voters with PO Boxes and non-residential addresses on file to submit proof of residence when updating their address but allows all others to perform the same tasks without imposing an additional evidentiary burden.

17

IV.    **SB 1111 violates the Twenty-Sixth Amendment.**

The State argues that SB 1111 does not violate the Twenty-Sixth Amendment because the law has not made voting more difficult; that SB 1111 allows college students to register to vote wherever they live; and that SB 1111 did not substantively change Texas's voter registration laws. *See* State's MSJ at 16-17. The State is wrong in all respects.

SB 1111's Temporary Relocation Provision substantively changed Texas's voter registration laws to prohibit Texas voters from registering at addresses they no longer "inhabit" at the time of registration, even if they are only temporarily away from that address and intend to maintain it as their true residence. Simultaneously, Texas law forbids these individuals from registering to vote at places where they intended to live only temporarily. The law thus creates a catch-22—college students who no longer inhabit their family homes at the time they register, and who also do not intend to remain indefinitely at temporary quarters in their college towns, have no clear address with which they may register to vote. The Temporary Relocation Provision thus operates as a denial or abridgment of the right to vote in violation of the Twenty-Sixth Amendment. Because the Temporary Relocation Provision cannot survive strict scrutiny, the State is not entitled to summary judgment. *See* Pls.' MSJ at 28-31.

Under the Twenty-Sixth Amendment,[6] a statute "denies" the right to vote if it results in a person being "prohibited from voting," and "abridges" the right to vote if it "makes voting *more difficult* for that person than it was before the law was enacted or enforced." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 188, 191 (5th Cir. 2020) ("*TDP II*"). The Temporary Relocation Provision prohibits college students and other young Texans who have temporarily relocated from

---

[6] The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1.

registering to vote using a home that they do not actively "inhabit" when they attempt to register, even if they consider that previous address to be their home. As Plaintiffs' expert, Dr. John Holbein, explains, "[i]n Texas the large majority of students living at dorms use . . . temporary housing locations as their voter registration address." Holbein Rep. at 39-40 (App. 065-66). Texas law always prohibited these students from establishing residence where they attend school unless they intended to remain there. SB 1111 now prohibits them from establishing residence at the home they inhabited before leaving for school, foreclosing all opportunities for them to register and vote.

The Temporary Relocation Provision, thus, is subject to strict scrutiny and cannot survive.[7] The Attorney General argues that SB 1111 advances several interests, including ensuring that people vote where they live, preventing fraud, promoting uniformity, and running efficient elections. *See* State's MSJ at 17. But the Temporary Relocation Provision furthers none of these interests; for many young Texans, the terms of the Temporary Relocation Provision foreclose them from voting *anywhere*. The State cannot advance an interest in preventing voter fraud by prohibiting eligible young Texans from voting altogether. *See Burdick*, 504 U.S. at 434.

Nor is the Temporary Relocation Provision narrowly tailored. Texas law elsewhere prohibits voters from providing false residence information on a voter registration form, which accomplishes the same objectives that the State purports to achieve through the Temporary Relocation Provision—ensuring people vote where they live—without depriving young voters of

---

[7] The applicable level of scrutiny for Twenty-Sixth Amendment claims remains an open question in the Fifth Circuit, *TDP II*, 978 F.3d. at 194, but other circuits have held that laws denying or abridging the right to vote an account of age are subject to heightened judicial scrutiny, *see, e.g.*, *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020) (applying *Anderson-Burdick* framework); *Walgren v. Howes*, 482 F.2d 95, 100-02 (1st Cir. 1973) (explaining that "compelling interest" standard would apply where town denied or abridged right to vote).

a place to register and vote with confidence that they are not breaking the law. *See* Tex. Elec. Code § 13.007. Further, by prohibiting young Texans from registering to vote at a place they may not currently inhabit but that may well be their domicile—their parents' home, for example—the Temporary Relocation Provision criminalizes a wider range of conduct than necessary to prevent voter fraud. It cannot withstand strict scrutiny and the State is not entitled to summary judgment on Plaintiffs' Twenty-Sixth Amendment claim.

## CONCLUSION

For all the foregoing reasons, and the reasons in Plaintiffs' motion for summary judgment, the Court should deny Intervenor-Defendant Ken Paxton's motion for summary judgment and grant judgment as a matter of law to Plaintiffs on each Count in the complaint.

Dated: May 23, 2022                    Respectfully submitted,


/s/ *Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Christopher D. Dodge*
Graham W. White*
Melinda K. Johnson*
Michael B. Jones*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
gwhite@elias.law
mjohnson@elias.law
mjones@elias.law

*Counsel for Plaintiffs*
*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on May 23, 2022, and that all counsel of record were served by CM/ECF.


/s/ *Uzoma N. Nkwonta*
Uzoma N. Nkwonta

21