**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| TEXAS STATE LULAC; VOTO LATINO, | |
| Plaintiffs, | |
| v. | |
| BRUCE ELFANT, in his official capacity as the Travis County Tax Assessor-Collector; JACQUELYN CALLANEN, in her official capacity as the Bexar County Elections Administrator; ISABEL LONGORIA, in her official capacity as the Harris County Elections Administrator; YVONNE RAMÓN, in her official capacity as the Hidalgo County Elections Administrator; MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator; LISA WISE, in her official capacity as the El Paso County Elections Administrator, | Case No. 1:21-cv-00546-LY |
| Defendants, | |
| and | |
| KEN PAXTON, in his official capacity as Attorney General of Texas; LUPE TORRES, in their official capacity as Medina County Election Administrator; TERRIE PENDLEY, in her official capacity as the Real County Tax-Assessor Collector, | |
| Intervenor-Defendants. | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT**
**OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I. The Residence Restriction violates the First Amendment. ............................................. 2

    II. SB 1111 unduly burdens the right to vote in violation of the First and Fourteenth
Amendments. ................................................................................................................... 6

    III. The Temporary Relocation Provision violates the Twenty-Sixth Amendment by
preventing newly and soon-to-be enfranchised young Texans from exercising their right
to vote............................................................................................................................... 11

    IV. Plaintiffs have standing to bring this lawsuit............................................................. 13

        A. Plaintiffs have organizational standing because Defendants' enforcement
        of SB 1111 has forced LULAC and Voto Latino to divert resources…………...13
        B. Plaintiffs also have organizational standing because Defendants' enforcement
        of SB 1111 chills their protected expression……………………………………..17
        C. Plaintiffs have standing to sue on behalf of their members, as well as on
        behalf of Latino citizens……………………….……………………………………19
        D. Plaintiffs have statutory standing…………………………………………...20

CONCLUSION.................................................................................................................. 20

## INTRODUCTION

The State's response to Plaintiffs' motion for summary judgment confirms that it has little to say about the constitutionality of Senate Bill 1111 ("SB 1111") as drafted. Instead, its primary tack is to pretend that the challenged law says something else altogether. *See* Def.-Intervenor Ken Paxton's Resp. to Pls'. Mot. for Summ. J. at 12-18 ("State's Resp."), ECF No. 154. But the State's litigation-driven reading of SB 1111 is contradicted by the law's plain text. The State offers next to no explanation as to how SB 1111's provisions are constitutional *as actually written* or as understood by the County Defendants—the only parties tasked with approving or rejecting a voter registration application. That reflects what Plaintiffs have shown through their motion: there is no dispute of material fact that the suppressive provisions of SB 1111 are unconstitutional. *See* Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 140.

The record also establishes that Plaintiffs have standing to bring this challenge. There is no factual dispute that LULAC and Voto Latino diverted resources away from critical programs central to their missions to counteract SB 1111's suppressive impacts. That alone is sufficient to establish standing, but there is more: unrefuted evidence shows that SB 1111 chills Plaintiffs' speech. Intervenors' argument to the contrary ignores that Texas law *criminalizes* encouraging registrants to put inaccurate information on a voter registration application—a serious risk to Plaintiffs, who now must advise their members and constituents on how to register without running afoul of SB 1111's vague and unconstitutional provisions. Further still, country registrars are *required* to notify law enforcement when they become aware of unlawful registration. The chill caused to Plaintiffs by SB 1111—and the risk that they will inadvertently misadvise a potential voter—supplies an additional basis for organizational standing.

Beyond these organizational harms, evidence of impacted voters has been supplied by Defendants themselves, who admit that voters are choosing not to register because of SB 1111.

But even without such evidence, LULAC has already explained how *each* of its members is harmed by SB 1111, establishing yet an additional basis for standing. And both LULAC and Voto Latino have representational standing to sue on behalf of those impacted by the law—particularly the younger, Latino voters that both organizations serve and advocate for. Plaintiffs are thus entitled to judgment as a matter of law.

## ARGUMENT

### I.    The Residence Restriction violates the First Amendment.

Rather than identify any factual dispute relevant to Plaintiffs' First Amendment claim, the State insists that the claim will rise or fall on how this Court interprets the Residence Restriction. But this framing does not help the State because its proffered interpretation of the statute is meritless. Under the only supportable interpretation of the Residence Restriction, Plaintiffs—and the registrants they serve—are at risk of criminal prosecution if they misadvise voters on how to complete voter application forms in view of SB 1111's confusing provisions. *See* Tex. Elec. Code § 15.028; Tex. Elec. Code § 13.007(a)(2). The State presents no other arguments—beyond its implausible statutory reading—defending the constitutionality of the Residence Restriction as written. The Court should therefore enter summary judgment for Plaintiffs on Count I.

"It is cardinal law in Texas that a court construes a statute, 'first, by looking to the plain and common meaning of the statute's words.'" *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 865-66 (Tex. 1999) (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482, 484 (Tex. 1998)); *see also McNeil v. Time Ins. Co.*, 205 F.3d 179, 183 (5th Cir. 2000) (explaining federal courts must use state rules of statutory construction when interpreting a state's statute). And the text here is crystal clear as to whether the Residence Restriction regulates would-

be voters who establish residence to engage in constitutionally-protected speech.[1] The law prohibits a person from establishing residency—and thus registering to vote—if they move to a domicile "for the purpose of influencing the outcome of a certain election." Tex. Elec. Code § 1.015(b).[2] Whatever the precise scope of the term "for the purpose of influencing the outcome of a certain election," it is clear the provision's text encompasses activities protected by the First Amendment and punishes those who establish residency within Texas to engage in such activities.

Ignoring this "cardinal law" of statutory construction, the State instead relies upon everything *except* SB 1111's text to support its reading. State's Resp. at 14-18. It points to "context," "corroborating circumstances," and "deference," concepts which do not come into play where, as here, the text is unambiguous. *See Fitzgerald*, 996 S.W.2d at 865. The meaning of SB 1111's *actual* text is critical because the law's "burden on protected speech cannot be justified if it could be avoided by a more carefully drafted statute." *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (concluding vague statute chilled speech even when susceptible to narrower reading). The State's repeated effort to run from the text of the statute makes clear that its reading is wrong, as further confirmed by the contrary interpretation given by each County Defendant. *See* Pls.' MSJ at 17-18 (collecting testimony).

---

[1] The law is vague in other respects, including with respect to the scope of it means to "influence an election." Pls.' MSJ at 13-17. But unrefuted testimony in this case makes clear that constitutionally-protected activities fall within the term's ambit. Ingram Tr. 100:3-19 (App. 240); Wise Tr. 86:20-87:1; Scarpello Tr. 78:13-15 (App. 182); Nagy Tr. 108:16-109:10 (App. 118-19).

[2] The State insists that the Residence Restriction must be read in light of § 1.015(a). State's Resp. at 15. Plaintiffs do not disagree—but the statute's unconstitutionality is only further confirmed when the Court "look[s] at the entire act, and not a single section in isolation," *Fitzgerald*, 996 S.W.2d at 866, as it must. Inserting subsection (a)'s definition of "residence" into § 1.015(b) reads as follows: "A person may not establish *domicile—that is, one's home and fixed place of habitation to which one intends to return after any temporary absence*—for the purpose of influencing the outcome of a certain election." Tex. Elec. Code §§ 1.015(a), (b). The State fails to explain how that language can possibly be read as applying solely to those seeking to register at residences they do not actually inhabit. That is because it *cannot* be read in such a manner.

Even if it was appropriate to reach the State's non-textual arguments, they do little to aid the State's position. The Secretary's mischaracterization of the Residence Restriction—as a prohibition on registering at impossible addresses alone, rather than a regulation of protected speech—is entitled to no deference because it "contradict[s] the plain language of the statute." *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011). Under Texas law, "courts grant deference to an agency's reasonable interpretation of a statute, but a precondition to agency deference is ambiguity; an agency's opinion cannot change plain language." *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013) (quotations omitted). The phrases "impossible addresses" or "where the person does not live" do not appear in § 1.015(b). The Texas Supreme Court "presume[s] the Legislature . . . drafts statutes with care, choosing each word for a purpose and purposefully omitting all other words." *In re Tex. Educ. Agency*, 619 S.W.3d 679, 687-88 (Tex. 2021). If the Legislature meant to pass the law that the State argues it did, it could have easily included the words "impossible addresses" or "where the person does not live" in the provision, but it did not. *See* Ingram Tr. 101:17-102:2 (App. 241-42). Moreover, Texas law *already* prohibited registration at impossible addresses and required voters to register where they reside. *See* Tex. Elec. Code § 1.015(a).[3]

The State's "corroborating circumstances" evidence about the Residence Restriction's meaning is similarly unpersuasive. The State points to *nothing* in the legislative history of SB 1111

---

[3] Deference to the Secretary's interpretation is also not appropriate because it is not reflected in any "formal opinions adopted after formal proceedings." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006). Instead, the Secretary disclosed its interpretation for the first time through its 30(b)(6) designee's deposition testimony, the kind of "isolated comments during a hearing" not entitled to deference. *Id.*; *see also* Ingram Tr. 94:6-10, 98:2-11 (App. 238-39). Mr. Ingram's interpretation, unsurprisingly, appears nowhere in the more formalized Election Advisories distributed to election officials after SB 1111's passage. *See* State's App. 000005-000008, ECF No. 138-2 (SB 1111 advisory); App. 363 (Secretary's SB 1111 presentation).

indicating these "circumstances" motivated or informed the Texas legislature, pointing instead to the deposition testimony of non-legislators. *See* State's Resp. at 16-18. This mid-litigation rationale does not qualify as the kind of "legislative history or other extrinsic aide,[]" that Texas courts sometimes rely upon when a statute is not "clear." *Tex. Health Presbyterian Hosp. v. D.A.*, 569 S.W.3d 126, 136 (Tex. 2018). More importantly, it is altogether clear that SB 1111 regulates *all* would-be registrants in Texas who move somewhere to influence an election, and not only those registering at so-called "impossible addresses." *See supra* 2-3. The interpretation the State urges requires a rewrite of the statute, but that is beyond this Court's power and responsibility. *Universal Amusement Co. v. Vance*, 587 F.2d 159, 172 (5th Cir. 1978) ("we cannot judicially rewrite the Texas statutes"), *aff'd*, 445 U.S. 308 (1980).

Regardless, the State's interpretation of the Residence Restriction is irrelevant to Plaintiffs' First Amendment injury because only county officials enforce the challenged provisions. As the State has repeatedly argued before *this Court* and the Fifth Circuit: Texas has a decentralized election structure and the Election Code "does not provide [the Secretary] the power to coerce local officials" given her "limited role under state law." Sec'y of State's Mot. to Dismiss at 3, *Gilby v. Hughs*, Case No. 1:19-cv-1063-LY (W.D. Tex. Dec. 10, 2019), ECF No. 21. Because "Texas voter registration is the [county] registrar's domain," "the [county] registrars—and not the Secretary—choose how and whether to enforce" registration requirements. Br. of Def.-App. Tex. Sec'y of State at 4, 21, *Tex. Democratic Party v. Hughs*, No. 20-50667 (5th Cir. Dec. 26, 2020). Here, the County Defendants made clear that they do not know how to apply the provision, or how to advise voters about its meaning, creating the harmful chill at issue. *See, e.g.*, Resp. of Def. Scarpello to Pls.' Interrog. No. 5 (App. 314-15); *see also* Pls.' MSJ at 15-17 (collecting testimony). And because the Secretary's office is not "charged with enforcing" SB 1111 (as Mr. Ingraham

admitted), its interpretation is not entitled to "serious consideration" from the Court. *R.R. Comm'n of Tex.*, 336 S.W.3d at 624; *see also* Ingram Tr. 38:20-22 (App. 234) (disclaiming enforcement responsibilities); *id.* at 45:9-46:19 (Reply App. 002-003); *id.* 70:13-16 (Reply App. 004).

The State and county intervenors offer no defense of the Residence Restriction apart from their a-textual reading. They do not dispute that the First Amendment is violated if this Court reads the Residence Restriction the same way each County Defendant does, and as Plaintiffs do. Nor do they suggest that this Court should apply anything other than strict scrutiny in reviewing the Residence Restriction under the First Amendment. The Restriction cannot survive, and the Court should grant Plaintiffs summary judgment on Count I.

## II.     SB 1111 unduly burdens the right to vote in violation of the First and Fourteenth Amendments.

Plaintiffs' opening motion and response set forth why each of SB 1111's suppressive provisions—two of which leave qualified voters in Texas without any acceptable residence for registering to vote—unconstitutionally burden the right to vote. *See* Pls.' MSJ at 20-28. At least one Defendant admitted they are already aware of an otherwise-eligible voter who decided not to register on account of the law. *See* Longoria Tr. 147:8-16 (App. 164).

The State's only response is to ignore those disenfranchised by SB 1111 and to mischaracterize the burdens imposed by the law. It insists that it is not burdensome for voters to "identif[y] . . . one's physical residence." State's Resp. at 20. But that is not what SB 1111 does. There is no dispute that Texas law already required registrants to register at a residential address. *See* Tex. Elec. Code § 1.015(a). Texas likewise already barred the use of so-called "impossible addresses" that correspond to non-residences. *Id*. Plaintiffs do not quibble with the State's requirement that voters provide a residential address. Plaintiffs challenge these new provisions in SB 1111 as written because they will disenfranchise Texas voters by leaving them with no legally

permissible residence to register with. *See, e.g.*, Pls.' MSJ at 15-17 (collecting testimony showing County Defendants do not understand how to apply Residence Restriction); *id.* at 23-24 (collecting testimony that County Defendants are unable to explain where college students would register under Temporary Relocation Provision); Resp. of Def. Scarpello to Pls.' Interrog. No. 4 (App. 313). Tellingly, neither the State nor the Intervenor-Defendant Counties offer *any* rationale for these suppressive provisions *as they are written*. If—as it should—the Court rejects the State's contrived statutory readings, it should enter summary judgment for Plaintiffs on that basis alone. *See Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 314 (S.D.N.Y. 2020) (granting judgment where the "State provide[d] no legitimate interest to justify th[e] burden" imposed by law).

The State's remaining arguments about the burden SB 1111 creates are limited. Skipping past the Residence Restriction altogether, the State and County Intervenors contend that the Temporary Relocation Provision is not burdensome because Texas permits college students to register on campus, including at a PO box address. State's Resp. at 20-21; Int.-Defs.' Resp. to Pls.' Mot. For Summ. J. ("Int.-Defs.' Resp.") at 10-11, ECF No. 155 (similar). But that, again, is not disputed. The problem is that Texas law only permits college students to register on campus if they intend to "make[] that place [their] home." Tex. Elec. Code § 1.015(d). College students, and other Texans temporarily away from home, do not "acquire a residence in a place to which the[y] ha[v]e come for temporary purposes only and *without the intention of making that place th[eir] . . . home*." *Id.* § 1.015(d) (emphasis added). Younger people in Texas tend to be more mobile than other types of voters and are thus likely to move frequently between temporary residences that they do not intend to make their indefinite homes. *See* Holbein Rep. at 35-41 (App. 061-67). Prior to SB 1111, these younger Texans retained the option of identifying a family home as their true domicile, provided it was the "fixed place of habitation" they "intend[ed] to return" to "after any temporary

absence." Tex. Elec. Code § 1.015(a). But the Temporary Relocation Provision eliminates that option, instead requiring that the registrant "inhabit[] the place at the time of designation *and intend[] to remain*." *Id.* § 1.015(f) (emphasis added). The result is that many Texans, and particularly college students and younger Texans, "are left without clear direction as to how to register to vote" and may be "left without a place to list when they try to register to vote." Holbein Rep. at 40 (App. 066). While Intervenors dismiss this burden, their briefs (tellingly) never explain where an individual who has relocated temporarily *can* establish residence under § 1.015(f)—since they do not inhabit their prior residence and do not intend to remain at their new, temporary location. The State's argument offers no relief to Texans who consider a family home to be their true domicile but who may no longer register to vote at that residence.[4]

As to the PO Box Provision, the State also briefly notes that voters without any fixed residential address may comply with SB 1111's onerous documentation requirements "by executing an affidavit stating that the voter's residence in [Texas] has no address, providing a concise description of the location of the voter's residence, and delivering the affidavit to the registrar with the voter's response to the confirmation notice." Tex. Elec. Code § 15.054(b); *see also* State's Resp. at 21; Int.-Defs.' Resp. at 11. But that, again, is not responsive to the burden identified in Plaintiffs' motion. *See* Pls.' MSJ at 25-28. SB 1111 now requires documentary proof from voters who supply a qualifying residential address to update an address that appeared to be a

---

[4] Intervenor-Defendants misread Texas law in arguing that § 15.054 of the Election Code "expressly allow[s] college students to use campus post office boxes to register to vote even though they may not intend to continue living on campus in the future." Int.-Defs.' Resp. at 10. That provision exempts college students from the prohibition on registering at a PO box, and from supplying proof of residence when registering at a PO box. But it does *not* exempt students from the *residency* requirements, including the Temporary Relocation Provision, located in § 1.015. That *separate* chapter and section of the code bars registering at a location "without the intention of making that place the person's home." Tex. Elec. Code § 1.015(d). College students only may register at a campus PO Box if they intend to make the campus their domicile, which many do not.

non-residential address. *See* Ingram Tr. 206:6-207:6 (App. 258-59). The Secretary's designee *admitted* he did not "know why we can't use this [new confirmation notice form] as a change of address form. If they're not still claiming to live at the impossible address, then I think we should maybe use this as a change of address form[.]" Ingram Tr. 222:8-12 (App. 266). The Secretary's view reflects the law as it existed *prior* to SB 1111—at that time, all registrants in Texas received the same confirmation notice form and were not required to furnish documentary proof when providing an updated residential address. *Id.* at 206:6-207:6 (App. 258-59). But as the Secretary's designee later admitted, because of the PO Box Provision, a registrant who appears to be registered at a non-residential address will now be placed on the suspense list for failing to provide documentary proof of residence, even when they otherwise supply all the information required by the change of address form. *Id.* at 221:4-224:2 (App. 266-68). The State has never explained why that is necessary and the Secretary's designee agreed that it is not.

While Plaintiffs' evidence of burden remains unrebutted, the State has also fails to point to any sufficiently weighty state interest in SB 1111. It contends it has "a valid interest in voters voting in the place where they live and obtaining the correct ballot style for each election." State's Resp. at 21. But the State fails to connect this purported interest to any of SB 1111's suppressive provisions. It cannot do so. The Residence Restriction, as explained, prohibits people from registering where they *do* live—it does *nothing* to further the State's claimed interest in preventing voters from casting ballots where they do *not* live. Likewise, the Temporary Relocation Provision bars Texans from registering at their true domicile if they are temporarily away from it—the State nowhere explains what interest that serves.

Any claim that the PO Box Provision serves the State's interest in verifying a voter's address is undercut by the fact that SB 1111 does not require *all* registrants to submit proof of

residence. To the contrary, voters whose registration addresses appear to no longer be accurate—but which happen to be residential addresses—have no obligation to include proof when updating their residence. Ingram Tr. 224:16-225:15 (App. 268-69). The State points to the indictment of the Mayor of Edinburg as proof this provision is necessary. *See* State's Resp. at 22. But that isolated case concerned the mayor's alleged effort to register voters "at the apartment complex he ow[n]ed." *Id.* at 16. In other words, it involved registration at a residential address—the PO Box Provision would have done *nothing* to prevent it, unless the voters had, by sheer coincidence, already been registered at a PO box. The State has presented no evidence that was the case and the Secretary's designee suggested it was not. *See also* Ingram Tr. 92:4-14 (Reply App. 005) (suggesting those involved were previously registered at residences elsewhere in Texas).

Finally, the State leans heavily on the argument that Plaintiffs' second claim is subject to lesser scrutiny. *See* State's Resp. at 18-19. That argument is academic. The "State provides no legitimate interest to justify th[e] burden[s]" imposed by SB 1111, and accordingly "the law cannot withstand *any* level of scrutiny." *Brehm*, 432 F. Supp. 3d at 314; *see also Lerman v. Bd. of Elections in N.Y.C.*, 232 F.3d 135, 149 (2d Cir. 2000) ("[T]he fact that the defendant[']s asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)). Even so, because the Residence Restriction regulates core political speech, and chills the speech of groups like Plaintiffs, it "plainly impose[s] a 'severe burden,'" which demands strict scrutiny. *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 208 (1999).

Likewise, the Temporary Relocation Provision disenfranchises voters left without a clear address at which to register. Laws that effectively disenfranchise eligible voters constitute "severe" burdens requiring strict scrutiny. *See Stewart v. Blackwell*, 444 F.3d 843, 869 (6th Cir. 2006); *Fla.*

10

*Democratic Party v. Detzner*, No. 4:16CV607-MW, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016). And regardless of how specifically the Court categorizes the burdens each provision imposes, the State must explain how each provision is "justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). It has not done so here.

### III.   The Temporary Relocation Provision violates the Twenty-Sixth Amendment by preventing newly and soon-to-be enfranchised young Texans from exercising their right to vote.

The Temporary Relocation Provision violates the Twenty-Sixth Amendment because it "makes voting more difficult" for younger Texans "than it was before the law was enacted or enforced." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 191 (5th Cir. 2020) ("*TDP II*"); *see also* Pls.' MSJ at 28-31. The State's primary response is to quibble about whether college students are actually "young" voters. But that ignores that Plaintiffs have clearly demonstrated that SB 1111 violates the Twenty-Sixth Amendment by "preventing newly enfranchised *young Texans* from exercising their right to vote." *Id.* at 28 (emphasis added). Plaintiffs' expert, Dr. Holbein, presented data showing that "[y]oung people in Texas are highly mobile," largely "because many young people are in a period of their lives where they often need to move for work or school." Holbein Rep. 36, 37; *see also id.* at 32 (noting that "young people move more often than older citizens" and "have to re-register to vote with each move").[5] That frequent movement is "amplified for the

---

[5] The Court also, of course, can take judicial notice that most college students are young adults, a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018) (recognizing that policy directed at college campuses "overwhelmingly" targeted group "young voters" and created burden that "bears [more] heavily on younger voters than all other voters"); *Benefield ex rel. Benefield v. Bd. of Trs. of Univ. of Ala. at Birmingham*, 214 F. Supp. 2d 1212, 1219 n.15 (N.D. Ala. 2002) (taking "judicial notice that most college freshmen are 18 years old, and quite often 17 years old"); *Soglin v. Kauffman*, 295 F. Supp. 978, 988 (W.D. Wis. 1968) (taking judicial notice of the "mean age of American

many Texas students who attend college and are either required or influenced by the behavior of their peers to move frequently while enrolled in college. *Id.* at 37 (noting universities often require their students to frequently move between available housing).[6]

The State offers little additional argument about any interest served by the Temporary Relocation Provision. *See* State's Resp. at 24-25. It contends that the provision furthers the interest of "verify[ing] [that] each Texas voter votes where he genuinely resides." *Id*. at 24. But the State nowhere explains how that is the case. In fact, the State cites only a few lines of deposition testimony from the Secretary's designee discussing the *Residence Restriction*, not the Temporary Relocation Provision, to support its argument. *Id.* at 25 (citing Ingram. Tr. 111:5-10, State's App. 53). Setting that aside, the testimony does not explain *at all* how any of SB 1111's provisions advance the generic interests the State has set forth.

Finally, the Court should reject the State's entreaty to apply rational basis review. Other courts have held that laws denying or abridging the right to vote on account of age are subject to heightened judicial scrutiny. *See, e.g.*, *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020); *Walgren v. Howes*, 482 F.2d 95, 100-102 (1st Cir. 1973). That makes sense—laws denying or abridging the right to vote based on age "imping[e] upon a fundamental right explicitly . . . protected by the Constitution." *Duarte v. City of Lewisville*, 858 F.3d 348, 353-54 (5th Cir. 2017). "Strict scrutiny

---

college and university students"), *aff'd*, 418 F.2d 163 (7th Cir. 1969). Census data from 2020 shows that 87.4% of college students were under the age of 35 and 67% were under the age of 25. U.S. Census Bureau, *School Enrollment in the United States: October 2020 - Detailed Tables* (Oct. 19, 2021), https://www.census.gov/data/tables/2020/demo/school-enrollment/2020-cps.html.

[6] The State's general assertion that college students may "register to vote using their home address or their college address," State's Resp. at 22, again requires an atextual interpretation of the statute. Students may only register to vote on campus if they consider their school to be their "residence" under the Texas Election Code. *See* Tex. Elec. Code §§ 1.015(a), (d). For those students who do not consider their school to be their residence—meaning they plan to live on campus temporarily and do not intend to remain there—they may register at their family's home address only if they "inhabit" it at the time they register and "intend to remain." *Id.* § 1.015(f).

is required" in such circumstances. *Id.*[7]

## IV.   Plaintiffs have standing to bring this lawsuit.

### A.   Plaintiffs have organizational standing because Defendants' enforcement of SB 1111 has forced LULAC and Voto Latino to divert resources.

LULAC and Voto Latino have organizational standing because they have been forced to divert resources to counteract Defendants' enforcement of SB 1111. Intervenor-Defendants willfully ignore the record evidence and controlling case law in arguing otherwise.

Plaintiffs can establish organizational standing due to a diversion of resources by identifying "specific projects [they] had to put on hold" or by "describ[ing] in detail how [they] had to re-double efforts in the community to" further their missions. *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 304 (5th Cir. 2000)). Plaintiffs have done so here: LULAC has declined to fund immigration reform and criminal justice reform programs, and has diverted funding away from its scholarship programs, to focus on educating voters about SB 1111's requirements. LULAC Tr. 30:10-13, 72:11-73:5 (App. 105, 113-14). Similarly, Voto Latino has had to divert funding away from its voter registration efforts in other states, including by cancelling its Colorado voter registration program entirely. Voto Latino Tr. 55:17-24, 56:7-9, 90:12-17 (App. 093-094, 098). This diversion of resources has impaired both Plaintiffs' ability to further their missions advocating for Latinos in the United States. LULAC Tr. 14:14-18 (App. 102); Voto Latino Tr. 26:8-17 (App. 086).

Real and Medina Counties argue that these diverted resources are not "significant" enough to "qualify as an Article III injury." Int.-Defs.' Resp. at 4 (quoting *Tenth St. Residential Ass'n v.*

---

[7] Because the State has offered no rational explanation as to how the Temporary Relocation Provision serves any of the generic state interests it has put forward, the Temporary Relocation Provision would still violate the Twenty-Sixth Amendment even if rational-basis review applied. *Cf. St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) ("[A] hypothetical rationale, even post hoc, cannot be fantasy"); *see also Brehm*, 432 F. Supp. at 314.

*City of Dall.*, 968 F.3d 492, 500 (5th Cir. 2020)). But whether a diversion of resources is sufficient to provide standing to an organization does not turn on whether that diversion was "significant," or even quantifiable. "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (same) (citing *Crawford*, 472 F.3d at 951; *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 18-84 (2000)); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 208 (W.D. Tex. 2020) (same); *see also Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (finding NAACP established standing in National Voter Registration Act challenge even where employee "had spent none of the NAACP's money" on voter registration efforts because the employee "devoted his time to the [voter registration] drives"). The plaintiff in *Tenth Street*, in contrast, could not establish standing because it failed to show that its alleged diversion of resources "differ[ed] from its routine [] activities" and it "provided no evidence that its members were required to forego other projects or causes as a result[.]" 968 F.3d at 500. Both LULAC and Voto Latino have easily cleared that threshold here.

Real and Medina Counties also claim that the record contains no evidence of what resources were diverted due to SB 1111 specifically, as opposed to other new laws in Texas. Int.-Defs.' Resp. at 4-5. That is simply false. *See, e.g.*, Voto Latino Tr. 90:9-18 (App. 098) (Q: "But what specific projects or activities has Voto Latino needed to divert resources from because of SB 1111? A: One is reducing the amount of voter contact and outreach and registration that we do within the state of Texas . . . . And the other has been shutting down the Colorado program."); LULAC Tr. 28:19-30:13 (App. 103-05) ("We're looking at the first time we're going to be

spending over maybe $1 million to $2 million in Texas to deal with the issues and the residency requirements and advising students").

The State, for its part, argues that there is no injury because Plaintiffs already educate voters on registration requirements. State's Resp. at 8-9. But Plaintiffs do not "routinely" dismantle other core programs to focus on voter education, and these new laws require Plaintiffs to retrain their staff or volunteers and expend additional resources determining which activities are lawful—a tall order given SB 1111's unique burdens and vague, sweeping restrictions on establishing residence. *See, e.g.*, LULAC Tr. 70:20-25 ("Q. I understood you to also claim that you're going to have to add additional language on voter registration drives to inform people of the new SB 1111 registration requirements; is that right? A. And our deputy voter registration train them so they don't make any mistakes.") (App. 112); Voto Latino Tr. 98:24-99:11 ("Q. Outside of the chilling effect . . . is there any other way the alleged restriction on political expression injures Voto Latino directly? A. Well, we have to better understand the law and we have to retool, so there's both . . . . [I]t impacts our ability to manage time and finite resources when it comes to capital and then our ability to actually conduct that effort with how we train our volunteers, how we communicate to our audience, how we communicate internally[.]") (Reply App. 008-009). All of this impairs Plaintiffs' missions and gives rise to organizational injury. For these reasons, this case is different from *NTEU v. United States*, 68 F.3d 1423, 1434 (D.C. Cir. 1995). There, the court found the organization's alleged injury insufficient to provide standing because the challenged law did not subject the organization to any operational costs "beyond those normally expended" as part of its "ordinary program." 68 F.3d at 1434. The State's reliance on *City of Kyle* and *Defense Distributed v. United States Department of State* also misses the mark: in both cases, the plaintiffs lacked standing because they relied *solely* on evidence of their "routine activities" to show impairment

without "identify[ing] specific projects that had to be put on hold or otherwise curtail[ed] in order to respond to the defendant's conduct." *Def. Distrib. v. Dep't of State*, No. 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238).

Indeed, the Fifth Circuit contrasted *City of Kyle* with two cases upholding organizational standing under similar facts to those here. *See City of Kyle*, 626 F.3d at 239 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *Browning*, 522 F.3d at 1166). *Havens Realty*—the seminal Supreme Court case on diversion of resources standing—held an organization was injured when it was forced to divert resources away from "its efforts to assist equal access to housing through counseling and other referral services" toward investigating the defendant's "racially discriminatory steering practices," even though the group's activities already included "the investigation and referral of complaints concerning housing discrimination." 455 U.S. at 368, 379. Similarly, in *Browning*, the Eleventh Circuit held that an organization was injured when it diverted resources toward educating voters about a voter registration statute that "would otherwise be spent" on *other* specific voter education activities. 522 F.3d at 1166. While LULAC and Voto Latino (like the *Havens Realty* and *Browning* plaintiffs) were forced to engage in efforts consistent with their routine activities, they did so to the detriment of other specific core programs—unlike the *City of Kyle* and *Defense Distributed* plaintiffs—impairing their organizational missions.

The State also contends that any diversion-of-resources injury is not traceable to the County Defendants because they "do not inquire into the veracity of a voter's claimed residence; nor do they inquire into the voter's motive" for listing a particular address on their voter registration form. State's Resp. at 12. Not so. County registrars process voter registration applications that are now governed by SB 1111 and are responsible for answering voter questions about the registration process. *See* Pls.' MSJ at 16-17; *see also supra* 5-6. Indeed, the Secretary's office told County

16

Defendants during a presentation on the effects of SB 1111 that the statute would "affect how you answer voter questions." App. 365. But the County Defendants testified they will not feel comfortable answering these questions given the statute's ambiguities, increasing the risk that voters will register improperly or simply "choose not to participate" in the democratic process. Wise Tr. 108:16-110:21 (App. 195-197); *see* Pls.' MSJ at 17-19; Def. Lisa Wise's Resp. to MSJ at 5, ECF No. 153 (lack of clarity in statute "has real impact on voters' ability to register and vote, as well as on Ms. Wise's (and other election officials') role overseeing voter registration"). Plaintiffs' diversion of resources to educate voters is therefore directly traceable to the County Defendants and redressable by a decision enjoining SB 1111.

**B.    Plaintiffs also have organizational standing because Defendants' enforcement of SB 1111 chills their protected expression.**

While Plaintiffs' diversion-of-resources injury is sufficient to confer standing, LULAC and Voto Latino also independently have standing because County Defendants' enforcement of SB 1111 has chilled them from engaging in voter registration efforts due to the threat of criminal prosecution for misadvising registrants. *See* Pls.' MSJ at 31. The State insists that is not so because SB 1111 "implicates no criminal penalties." State's Resp. at 7. But that ignores the fact that, under Texas law, Plaintiffs could be prosecuted, or investigated or threatened with prosecution, for misadvising voters about SB 1111's vague and unconstitutional requirements. *See* Tex. Elec. Code § 13.007(a)(2) ("A person commits an offense if the person knowingly or intentionally . . . requests, commands, coerces, or attempts to induce another person to make a false statement on a registration application."). As Plaintiffs also explained, and as the State does not dispute, the County Defendants are required to notify law enforcement if they become aware of unlawful voting or registration. Pls.' MSJ at 32 (citing Tex. Elec. Code § 15.028). That risk of criminal referral, coupled with SB 1111's burdensome and vague provisions, chills Plaintiffs from openly

17

communicating with potential Texas voters. *Id.* at 31-32. This in and of itself constitutes a direct, cognizable injury sufficient for standing purposes.

The State also argues that the record evinces no "real and immediate" or "certainly impending" threat of prosecution because Plaintiffs have not identified an individual who has faced prosecution or found the law confusing. State's Resp. at 7-8; Int.-Defs.' Resp. at 3-4 (similar). That is not accurate. *See* Longoria Tr. 147:8-16 (App. 164) (describing a voter who "intended to no longer register to vote in Harris County" because "he was confused" about SB 1111). Regardless, "a plaintiff who mounts a pre-enforcement statutory challenge on First Amendment grounds 'need not show that the authorities have threatened to prosecute him . . . the threat is latent in the existence of the statute.'" *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)). The State's argument neglects also that the chill inflicted on LULAC and Voto Latino is due not just to the risk that individuals will be prosecuted because of SB 1111, but that the organizations themselves could be as well.

The State again misses the mark by insisting that any chilling effect is not traceable to the County Defendants because local prosecutors—not county registrars—prosecute criminal offenses under the Election Code. State's Resp. at 9; *see also* Int.-Defs.' Resp. at 4. The threat that County Defendants will refer Plaintiffs for criminal prosecution is, by itself, sufficient to chill Plaintiffs' expression and as such there is no need for Plaintiffs to separately sue local prosecutors. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 153, 159-61 (2014) (finding plaintiff had standing to bring First Amendment claim due to chilling effect of possible referral for criminal prosecution by non-party prosecutors). Even if, *arguendo*, complete relief required including local prosecutors as parties, the partial relief available from enjoining country registrars from enforcing the law is

sufficient to grant Article III standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) (holding that "the ability 'to effectuate a partial remedy' satisfies the redressability requirement").

### C.   Plaintiffs have standing to sue on behalf of their members, as well as on behalf of Latino citizens.

Intervenor-Defendants argue that LULAC lacks associational standing because it has not identified specific members who have been injured by SB 1111. State's Resp. at 6; Int-Def.'s Resp. at 5-6. But as explained, *all* of LULAC's members are harmed because SB 1111 "interferes with Plaintiffs' abilities to encourage and support voter registration" among its members. Compl. ¶ 63; *see* LULAC Tr. 28:19-30:13 (App. 103-05); *id.* at 31:14-32:4 (App. 106-07).[8] As such, it violates the "well established" principle "that the Constitution protects the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (quoting *Stanley v. Georgia,* 394 U.S. 557, 564 (1969)). Because LULAC's members are all harmed in their ability to receive information and ideas, "th[e] requirement of naming the affected members" is "dispensed with." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).

LULAC and Voto Latino, moreover, have third-party standing to sue on behalf of Latinos who will be affected by SB 1111 when they register to vote or move to a new residence, especially younger voters and soon-to-be voters. Pls.' MSJ Resp. at 6-7. Real and Medina Counties claim that Plaintiffs have failed to offer evidence of a "close relationship" with this constituency. Int.-Defs.' Resp. at 8. Not so. Such a relationship is manifest from Plaintiffs' objectives of protecting the voting rights of Latinos in Texas and throughout the country, and in particular their longstanding efforts to register younger Latino voters. *See* Pls.' MSJ Resp. at 6-7 (collecting testimony). And notwithstanding Real and Medina Counties' insistence to the contrary, Int-Defs.'

---

[8] SB 1111 also acutely harms discrete groups within LULAC. *See* LULAC Tr. 31:5-13 (App. 106) (explaining that LULAC's hundreds of youth members will be harmed by SB 1111).

Resp. at 9, many of these individuals—as minors and persons who have not yet moved to Texas—are hindered in their ability to protect their own interests. *See* Pls.' MSJ Resp. at 7.

### D. Plaintiffs have statutory standing.

Finally, Intervenor-Defendants insist that Plaintiffs, as organizations without voting rights, lack standing to assert claims under § 1983. State's Resp. at 11; Int-Defs.' Resp. at 7. But that argument ignores that Plaintiffs allege a violation of their *own* First Amendment rights. *See* Compl. ¶ 63 (alleging that "the Residence Restriction will also chill Plaintiffs' *own* speech and advocacy" because "[b]y adding confusion and the risk of criminal liability to the registration process, the Residence restriction interferes with Plaintiffs' abilities to encourage and support voter registration—activity protected by the First Amendment."); LULAC Tr. 28:19-30:13 (App. 103-05); *id.* at 31:14-32:4 (App. 106-07); Voto Latino Tr. 53:17-54:16 (App. 090-091). Plaintiffs have established both Article III and statutory standing to bring their First Amendment claim.

For the reasons previously explained, this Court should follow the decisions of other courts that have allowed plaintiffs with organizational standing to assert § 1983 claims. *See* Pls.' Resp. at 8-9 (citing cases). And because Plaintiffs have brought claims in their own right, the Court may not dismiss them for "prudential" reasons. *See Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014) ("A court cannot limit a cause of action merely because 'prudence' dictates." (cleaned up).[9]

### CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment as a matter of law on Counts I-III of the Complaint.

---

[9] To the extent the State argues that Plaintiffs lack statutory standing to bring § 1983 claims on behalf of their members, *see* State's Resp. at 11-12, that argument is foreclosed by controlling Fifth Circuit precedent. *See Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1278 (5th Cir. 1972).

Dated: May 31, 2022

Respectfully submitted,

*/s/ Uzoma Nkwonta*
Uzoma N. Nkwonta*
Christopher D. Dodge*
Graham W. White*
Melinda K. Johnson*
Michael B. Jones*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
gwhite@elias.law
mjohnson@elias.law
mjones@elias.law

*Counsel for Plaintiffs*
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2022, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| TEXAS STATE LULAC;<br>VOTO LATINO,<br>　　　　　　　　　Plaintiffs,<br>　　　v.<br><br>BRUCE ELFANT, in his official capacity as the<br>Travis County Tax Assessor-Collector;<br>JACQUELYN CALLANEN, in her official<br>capacity as the Bexar County Elections<br>Administrator; ISABEL LONGORIA, in her<br>official capacity as the Harris County Elections<br>Administrator; YVONNE RAMÓN, in her official<br>capacity as the Hidalgo County Elections<br>Administrator; MICHAEL SCARPELLO, in his<br>official capacity as the Dallas County Elections<br>Administrator; LISA WISE, in her official capacity<br>as the El Paso County Elections Administrator,<br><br>　　　　　　　　　Defendants,<br>　　and<br><br>KEN PAXTON, in his official capacity as Attorney<br>General of Texas; LUPE TORRES, in their official<br>capacity as Medina County Election Administrator;<br>TERRIE PENDLEY, in her official capacity as the<br>Real County Tax-Assessor Collector,<br><br>　　　　　　　　　Intervenor-Defendants. | Case No. 1:21-cv-00546-LY |

## REPLY APPENDIX TO PLAINTIFFS TEXAS STATE LULAC AND VOTO LATINO'S REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

　　　　Under Local Rule CV-7(c)(1), Plaintiffs Texas State LULAC and Voto Latino submit this Reply Appendix to their Reply Brief in Support of their Motion for Summary Judgment, filed contemporaneously herewith.

## <u>TABLE OF CONTENTS</u>

**Deposition Transcripts**

Secretary of State John Scott 30(b)(6) (Brian Keith Ingram) Deposition Excerpts...Reply App. 001

Voto Latino 30(b)(6) (Maria Teresa Kumar) Deposition Excerpts………….…....…Reply App. 006

Dated: May 31, 2022                         Respectfully submitted,


                                            */s/ Uzoma N. Nkwonta*
                                            Uzoma N. Nkwonta*
                                            Christopher D. Dodge*
                                            Graham W. White*
                                            Melinda K. Johnson*
                                            Michael B. Jones*
                                            **ELIAS LAW GROUP LLP**
                                            10 G Street NE, Suite 600
                                            Washington, D.C. 20002
                                            Telephone: (202) 968-4490
                                            Facsimile: (202) 968-4498
                                            unkwonta@elias.law
                                            cdodge@elias.law
                                            gwhite@elias.law
                                            mjohnson@elias.law
                                            mjones@elias.law

                                            *Counsel for Plaintiffs*
                                            *Admitted *Pro Hac Vice*


## CERTIFICATE OF SERVICE

On May 31, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


                                            */s/ Christopher D. Dodge*
                                            Christopher D. Dodge

Case 1:21-cv-00546-LY   Document 160-2   Filed 05/31/22   Page 5 of 13

4/29/2022          Texas State LULAC, et al., v. Bruce Elfant, et al.   Brian Ingram 30(b)(6)

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

_____
TEXAS STATE LULAC; VOTO          )
LATINO,                          )
        Plaintiffs,              )
                                 )
    -vs-                         )
                                 )
BRUCE ELFANT, in his             )
official capacity as the         )
Travis County Tax                )   Case No.
Assessor-Collector, et           )   1:21-cv-00546-LY
al.,                             )
        Defendants,              )
                                 )
        and                      )
                                 )
KEN PAXTON, in his               )
official capacity as             )
Attorney General of              )
Texas, et al.,                   )
        Intervenor-              )
        Defendants.              )
_____      )

VIDEOTAPED RULE 30(b)(6) DEPOSITION OF
JOHN B. SCOTT, TEXAS SECRETARY OF STATE
TAKEN REMOTELY VIA VIDEOCONFERENCE
BY AND THROUGH ITS DESIGNEE
BRIAN KEITH INGRAM
APRIL 29, 2022 | 9:07 A.M.


REPORTED BY:
DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 45

1    application of the Texas Election Code?

2           A.    Well, like I said, we issue

3    advisories and mass e-mails.  If we -- if we are

4    getting a similar question from a number of

5    counties, we will sometimes issue a mass e-mail

6    that will answer that question for all the

7    counties so that we can make sure that we're all

8    on the same page.

9           Q.    If it came to your awareness that a

10   county was incorrectly interpreting the Texas

11   Election Code and applying it incorrectly, what

12   -- what actions would your office take?

13          A.    Well, sometimes we will call an

14   election administrator and say, "It's our

15   understanding this is occurring.  Is that the --

16   is that the way you understand it?"

17                And they'll either say, "No, that's

18   not at all what's happening, this is what's

19   happening," or they will say, "Yes."

20                And then we'll explain to them that

21   that's not in compliance with the code.

22                But all we can do is talk to them.

Page 46

1    We can't do anything else in an enforcement sort

2    of way, except that we have leverage with the

3    counties because they want to get it right and

4    they believe if they do what we explain that

5    they need to do, that they will be getting it

6    right and be in safe harbor.

7          Q.     Is there, in fact, any safe harbor

8    provision in the Texas Election Code if a county

9    is acting on the advice of the Secretary of

10   State's Office?

11         A.     No.

12         Q.     And if a county official had a

13   disagreement with you about an interpretation of

14   the Texas Election Code, and they persisted in

15   acting upon that interpretation even after you

16   advised them otherwise, would they be permitted

17   to keep interpreting the Texas Election Code in

18   that manner?

19         A.     Sure.  What could we do?

20         Q.     So, theoretically, the Texas

21   Election Code permits a county to interpret the

22   Texas Election Code in a manner inconsistent

Page 70

```
 1            office.

 2     BY MR. DODGE:

 3            Q.     Does your office --

 4            A.     -- so local district attorneys --

 5                   THE REPORTER:  I didn't hear the

 6            beginning of that.

 7                   THE WITNESS:  The county attorneys.

 8            And then local district attorneys, if the

 9            county has a district attorney in addition

10            to the county attorney as well as the

11            Attorney General's office.

12     BY MR. DODGE:

13            Q.     Does your office assist law

14     enforcement officials in investigating

15     violations of the Texas Election Code?

16            A.     No.

17            Q.     If your office became aware of

18     someone -- strike that.

19                   If your office became aware of a

20     violation of the Texas Election Code, what would

21     you do?

22            A.     Well, 31.006 says if we have
```

**Reply App. 004**

Page 92

1    district that I preferred, but that doesn't mean

2    that I was establishing residence to influence

3    the outcome of a particular election.

4                    In order to meet the qualifications

5    of this what you have to do is do what, I don't

6    know, 20 or 30 people did with regard to the

7    mayoral election in the City of Edinburg.  And

8    that is, maintain their residence in Palmview,

9    for instance, or McAllen or San Benito, but then

10   claim residence in Edinburg so that they

11   register to vote at an apartment complex in

12   Edinburg where they had never lived and then

13   proceed to vote for mayor because they wanted to

14   particular mayoral candidate to win.

15                   That's illegal voting.  Those

16   were -- those were indicted and prosecuted.

17   That's what I think this is talking about.

18                   There was another instance where

19   there was a road utility district in Montgomery

20   County, where 10 people, I think it might have

21   been fewer than that, but as many as 10 people

22   registered to vote at a roadway inn that some of

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS STATE LULAC; VOTO LATINO, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| BRUCE ELFANT, IN HIS OFFICIAL AS THE TRAVIS COUNTY TAX ASSESSOR-COLLECTOR; JACQUELYN CALLANEN, IN HER OFFICIAL CAPACITY AS THE BEXAR COUNTY ELECTIONS ADMINISTRATOR; ISABEL LONGORIA, IN HER OFFICIAL CAPACITY AS THE HARRIS COUNTY ELECTIONS ADMINISTRATOR; YVONNE RAMON IN HER OFFICIAL CAPACITY AS THE HIDALGO COUNTY ELECTIONS ADMINISTRATOR; MICHAEL SCARPELLO, IN HIS OFFICIAL CAPACITY AS THE DALLAS COUNTY ELECTIONS ADMINISTRATOR; LISA WISE, IN HER OFFICIAL CAPACITY AS THE EL PASO COUNTY ELECTIONS ADMINISTRATOR | § | CASE NO. 1:21-CV-00546-LY |
| | § | |
| DEFENDANTS, | § | |
| | § | |
| AND KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS, LUPE C. TORRES, IN HER OFFICIAL CAPACITY AS MEDINA COUNTY ELECTIONS ADMINISTRATOR, AND TERRIE PENDLEY, IN HER OFFICIAL CAPACITY AS REAL COUNTY TAX ASSESSOR-COLLECTOR | § | |
| | § | |
| INTERVENOR-DEFENDANTS. | § | |

**Reply App. 006**

1 _____

2              ORAL AND VIDEOCONFERENCE DEPOSITION OF

3                    MS. MARIA TERESA KUMAR

4                       APRIL 5, 2022

5 _____

6              ORAL AND VIDEOCONFERENCE DEPOSITION OF

7   MS. MARIA TERESA KUMAR, produced as a witness at the

8   instance of the INTERVENOR-DEFENDANT, and duly sworn,

9   was taken in the above-styled and numbered cause on

10  APRIL 5, 2022, from 11:02 a.m. to 3:10 p.m., before

11  Michelle Hartman, Certified Shorthand Reporter and

12  Registered Professional Reporter in and for the State of

13  Texas, reported by machine shorthand via Zoom

14  videoconference, pursuant to the Federal Rules of Civil

15  Procedure, the Emergency Orders regarding the COVID-19

16  State of Disaster, and the provisions stated on the

17  record or attached hereto.

18

19

20

21

22

23

24

25

```
 1    a moment.  But in terms of basic freedom of political

 2    expression, is there anything else?

 3              A.  Well, it restricts, as an organization,

 4    our ability to speak freely.  It has a chilling effect

 5    on how we communicate to our voters because we're not

 6    able to provide them with clear rules so that they

 7    don't -- aren't impacted.  So I'd say personal, you

 8    know --

 9              Q.  Mm-hmm.

10              A.  -- personal infringement on the

11    organization.

12              Q.  And your constituents, are they candidates

13    for office?

14              A.  They may be.  We've had people that we've

15    registered that have later on run for office, if that's

16    the question.

17              Q.  But you don't know who they are, do you?

18              A.  That have later run?  Yes, we're --

19    we're -- we applaud them to be part of the democracy.

20              Q.  Have any of those constituents who later

21    run for office expressed their concern about moving in

22    because of SB 1111?

23              A.  We haven't asked them.

24              Q.  Outside of the chilling effect, which you

25    talked about as being specific to Voto Latino, is there
```

Page 99

```
 1    any other way that the alleged restriction on political
 2    expression injures Voto Latino directly?
 3              A.   Well, we have to better understand the law
 4    and we have to retool, so there's both.  You know, it
 5    impacts our ability to manage time and finite resources
 6    when it comes to capital and then our ability to
 7    actually conduct that effort with how we train our
 8    volunteers, how we communicate to our audience, how we
 9    communicate internally, and how we are able to, again,
10    speak freely without concern that we are not informing
11    the person.
12              Q.   I'm going to pull this down for a moment
13    and we're going to go to Exhibit 6.  I don't believe
14    I've shared that one yet, so let me quickly put that
15    in -- in the chat box.  All right.
16                   Do you see the document on your screen?
17                   (WHEREUPON, the document was marked for
18                   identification as Exhibit No. 6 and is
19                   attached hereto.)
20         A.   Mm-hmm.
21         Q.   This reads Senate Bill 1111, correct?
22         A.   Mm-hmm.
23         Q.   And I'm presenting to you that this is the
24    enrolled version of the bill, which is the one that was
25    enacted by both chambers and signed by the Governor.
```

**Reply App. 009**