# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS STATE LULAC; VOTO LATINO, *Plaintiffs*, | § § § | |
| v. | § § | |
| BRUCE ELFANT, in his official capacity as the Travis County Tax Assessor-Collector; JACQUELYN CALLANEN, in her official capacity as the Bexar County Elections Administrator; ISABEL LONGORIA, in her official capacity as the Harris County Elections Administrator; YVONNE RAMON, in her official capacity as the Hidalgo County Elections Administrator; MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator; and LISA WISE, in her official capacity as El Paso County Elections Administrator, *Defendants*, | § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 1:21-CV-546-LY |
| and | § § | |
| KEN PAXTON, in his official capacity as the Attorney General of Texas, LUPE C. TORRES, in his official capacity as Medina County Elections Administrator, and TERRIE PENDLEY, in her official capacity as Real County Tax Assessor-Collector, *Intervenor-Defendants*. | § § § § § § § § § | |

**INTERVENOR-DEFENDANTS KEN PAXTON, LUPE C. TORRES, AND TERRIE PENDLEY'S REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL**

I. **A Stay Pending Appeal is Warranted Given the Serious, Novel Legal Questions Raised by Intervenors.**

    A. **The Court Lacked Jurisdiction to Hear This Case.**

Plaintiffs have failed to prove that they have either constitutional or statutory standing with respect to each provision they challenged. As Intervenors noted in their Motion to Stay, for diversion of resources to constitute cognizable harm, "[t]he change in plans must still be in response to a reasonably certain injury *imposed by the challenged law*." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018) (emphasis added). In other words, the diversion of resources must be traceable to the contested statute, and it must be made to prevent the organization from suffering what otherwise would be an injury-in fact. Plaintiffs do not meet either requisite. The corporate representative of each Plaintiff admitted that the organization altered their programs and activities in response to "all the other laws that came into effect post-January," including election laws in other states. Paxton's Mot. Summ. J. App. 258, ECF 138-8 (Voto Latino Dep. 55:14–56:16); App. 163–64, ECF 138-4 (LULAC Dep. 28:19–30:18). And each representative stated that they could not tease out what portion of their resources went toward SB1111, if any, and what went to counteract separate legislation.

Plaintiffs counter that the representatives identified the programs that were affected by SB1111, but these self-serving statements at most introduce a genuine issue of material fact given that the diversion of resources must be "significant" to constitute an injury and the other laws Plaintiffs cite as contributing to the diversion of resources introduced extensive changes to which Plaintiffs would have had to react. *NAACP. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010); *see, e.g.*, App. 167, 169, ECF 138-4 (LULAC Dep. 41:2–4, 50:8–19) (stating that $1 to 2 million LULAC intended to spend were in response to SB1111 and SB1). Plaintiffs had an obligation to show that the specific provisions they challenged—as opposed to other election laws—caused their alleged financial injury. *See California v. Texas*, 141 S. Ct. 2104, 2115, 2119 (2021). Because Plaintiffs could not point to a drain on their resources attributable to the challenged provisions alone, they lack standing.

What's more, Plaintiffs have failed to identify a reasonably certain injury that their alleged expenditures were directed at, which is fatal to their diversion of resources theory. The principal focus of Plaintiffs' alleged disbursements were changes made to educate staff and voters about the new residency requirements. But courts have held that voter education and an interest in seeing the law obeyed are abstract concerns insufficient to confer standing, particularly when the organization already conducts such efforts as part of its routine activities. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433–34 (D.C. Cir. 1995). Plaintiffs argue that the "costs" attributable to SB1111 are "'beyond those normally expended' in pursuit of Plaintiffs' mission." Pls. Resp., ECF 182 at 13 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434)). But, again, Plaintiffs conflate the combined effects of multiple laws rather than focusing on the impact that the challenged provisions alone had on their programs and activities. Voto Latino's corporate representative specifically stated that the organization ceased its operations in Colorado as a consequence of laws in Arizona, Georgia, and Texas as well Voto Latino's lobbying efforts in Congress. App. 261, ECF 138-8 (Voto Latino Dep. 68:1–24). The elimination of the program is not evidence that SB1111 forced Plaintiffs to assume out-of-the-ordinary expenses.

The other injury Plaintiffs claim is a chill to their First Amendment rights. However, the only provision Plaintiffs challenged pursuant to the Free Speech Clause, Tex. Elec. Code § 1.015(b), is directed at voters, not organizations that aid voters in registering to vote. Plaintiffs claim that a separate provision in the Election Code, § 13.002(a)(2), which predates SB1111, extends liability to Plaintiffs, but even assuming that interpretation is correct, § 13.002(a)(2) states that the entity must "*knowingly or intentionally* … induce another person to make a false statement on a registration application" for liability to attach. (Emphasis added). Plaintiffs have not presented evidence that they intend to meet this mens rea. Plaintiffs contend that their lack of mens rea is irrelevant because the risk of prosecution remains, ECF 182 at 14, but Plaintiffs have exerted no effort to determine how enforcement agencies would interpret either § 1.015(b) or § 13.002(a)(2), and they have cited no evidence that county

3

registrars would refer them for prosecution in the event that a voter they assisted submitted wrong information without Plaintiffs' knowledge. Their entire argument hinges on a "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013). That is particularly the case regarding § 15.051(a), which is not a criminal statute, and has no effect beyond requiring registrars to send a confirmation notice to voters who register using an impossible address.

Turning to statutory standing, Section 1983 provides a cause of action only when the plaintiffs suffer "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In short, plaintiffs must have suffered a constitutional wrong. An injury to plaintiffs' pocketbook, such as a diversion of resources, is not sufficient. After all, "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011). In its order, this Court cites a number of cases that allowed an organization to litigate a Section 1983 claim, but each of these organizations were bringing suit on behalf of their members, who suffered a deprivation of rights. *See Order on Cross-Mots. Summ. J.,* ECF 171 at 14. The Court correctly determined that Plaintiffs lacked associational standing. *Id.* at 6–7. Plaintiffs therefore must rely on their own constitutional rights to qualify for relief under Section 1983, which is limited to their claim that SB1111 chills their ability to advise voters.

As abovementioned, Plaintiffs only brough a Free Speech claim against § 1.015(b). Intervenor Paxton maintains for the reasons stated herein—and in earlier briefings—that the provision only applies in narrow circumstances and that Plaintiffs' fear is not only speculative but also based on a misinterpretation of the law. However, even if this Court were to accept Plaintiffs' assertion, the imposition that the Residence Provision allegedly has on Plaintiffs' First Amendment rights cannot

4

confer statutory standing for Plaintiffs to challenge the P.O. Box Provision and the Temporary Relocation Provision under an *Anderson-Burdick* claim. This is because "standing is not dispensed in gross." *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019). And Plaintiffs cannot bootstrap an injury from one statutory provision to challenge another. *See California*, 141 S. Ct. at 2115, 2119. They must meet the requirement for each provision they challenge and the relief that they seek.

### B. The P.O. Box Provision Does Not Unduly Burden the Right to Vote.

Plaintiffs gloss over the Court's finding that the P.O. Box Provision furthers important state interests by helping voters get the right ballots and preventing voter-registration fraud. ECF 171 at 24–25. Plaintiffs instead focus on the Court's conclusion that in one possible circumstance, where Texans change their address to a valid residential address, the P.O. Box Provision imposes an unjustified burden. ECF 182 at 11–12. But Plaintiffs brought a facial challenge, and "[a] facial challenge must fail where the statute has a plainly legitimate sweep," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 (2008) (quotation omitted), which the Court recognized it does. Moreover, the severity of the burden is measured based on how it affects voters as a group, *id.* at 202-03, and any burden here is minimal. Because this Court acknowledged that requiring documentation of residence from voters who register with a P.O. box is not a severe restriction but rather a reasonable and nondiscriminatory restriction, ECF 171 at 24–25, the law does not need to be narrowly tailored to the State's interests. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). A determination that one possible application of the P.O. Box Provision may not directly advance the State's interests in preventing voter-registration fraud and getting the correct ballots to voters is therefore not sufficient to prove—as a matter of undisputed fact—that the P.O. Box Provision imposes an unconstitutional burden and should be partially enjoined.

Nor did Plaintiffs offer other evidence to prove the P.O. Box Provision imposes an undue burden. As Intervenors noted in their Motion to Stay, ECF 174 at 9, which Plaintiffs did not rebut in

5

their response, Plaintiffs provided no evidence that voters who change their address have difficulty complying with the documentation requirement. *See Crawford*, 553 U.S. at 198 (analyzing the burden on voters of obtaining identification rather than the consequence of attempting to vote without identification). Furthermore, even if the consequences of not complying with the P.O. Box Provision was a relevant factor under the *Anderson-Burdick* balancing test—which it is not—Plaintiffs have no evidence that a failure to comply would prevent Texans from voting or otherwise unconstitutionally burden their voting rights. *See* ECF 174 at 9. After all, Texans who fail to comply and are placed on the suspense list can still vote by regular ballot as long as they sign a statement of residence. *See id.* The response thus does not negate Intervenors' showing that they are likely to succeed on appeal that the P.O. Box Provision is lawful.

### C. When Read in Proper Context, the Residence Provision Does Not Limit Expressive Conduct.

Intervenor Paxton explained at length in his briefing for summary judgment how the Residence Provision, when read in context of the Election Code, only applies when voters register at an address that is not their domicile for the purposes of influencing an election.[1] *See, e.g.*, ECF 138 at 10–12; Paxton's Resp. to Pls. Mot. For Summ. J., ECF 154-1 at 14–16. Subsection (a) provides that a "residence" is a "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence." Tex. Elec. Code § 1.015(a). Subsection (b), the residence provision challenged here, provides that "[a] person may not establish residence for the purpose of influencing the outcome of a certain election." Taken together, a person may establish any residence he chooses—so long as his intent in doing so is to make that residence his fixed place of habitation. *Id.* at § 1.015(b). Plaintiffs ignore these arguments, stating instead that Intervenor Paxton relied

---

[1] As previously noted, Intervenors Torres and Pendley take no position regarding the interpretation of Texas Election Code § 1.015(b). That they take no position does not render the Attorney General's position incorrect. Contra ECF 182 at 1.

exclusively on the historical context surrounding SB 1111's passage to support the State's interpretation of § 1.015(b). ECF182 at 4. This is false. Texas law provides that "[i]n construing a statute . . . a court may consider among other matters" the "circumstances under which the statute was enacted," along with "the consequences of a particular construction." Tex. Gov't Code § 311.023. Intervenor Paxton explained the events leading up to SB1111 in that capacity.

Plaintiffs also contend that the Residence Provision regulates core political speech. ECF 182 at 7. However, there is no expressive conduct associated with using your home address to vote. For conduct to be protected by the First Amendment, it must contain sufficient "communicative elements" such as being intended to convey a particular message and a likelihood that the message will be understood. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). The act of registering to vote where one lives does not meet these characteristics, as it is required of all voters, and observers would not be able to apprehend the meaning behind the voter's message assuming one was intended. Plaintiffs' constitutional claims regarding the residence provision thus depend on adopting an expansive interpretation of § 1.015(b) that is contrary to the interpretation of the Secretary of State, *see* App. 048, ECF 138-3 (Ingram Dep. 90:18–4); the requirement that statutes be construed as a whole, *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018); and the canon of constitutional avoidance, *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998); Tex. Gov't Code § 311.021(1).

Plaintiffs seem to argue that the Court should nonetheless adopt Plaintiff's interpretation because to do otherwise would render the provision surplusage. But the Supreme Court of Texas has recently confirmed that that canon is not the unwavering demand that Plaintiffs' argument requires. *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 579–83 (Tex. 2022). Plaintiffs also ask the Court to reject the Secretary of State interpretation because the Secretary offered it during litigation rather than through a more formal process. However, Plaintiffs filed this lawsuit just one week after the Governor signed SB1111 into law and then proceeded to litigate this case on an expedited schedule. The

Secretary never had the chance to complete the formal process prior to litigation as a result of Plaintiffs' rush to the courthouse. Nor had the Secretary received any official inquiries from registrars, voters, or even Plaintiffs concerning the enforcement of § 1.015(b) that would have triggered a more formal proceeding. If anything, Plaintiffs' argument highlights why courts caution restraint when confronted with a pre-enforcement, facial challenge to a state law; it "carries too much promise of 'premature interpretatio[n] of statutes.'" *Sabri v. United States*, 541 U.S. 600, 609 (2004) (*quoting United States v. Raines*, 362 U.S. 17, 22 (1960)).

### D. The Temporary-Relocation Provision Allows College Students to Establish Residence at Their Family Home or College Housing.

As Intervenors explained in their Motion to Stay, the Temporary-Relocation Provision does not disenfranchise college students, and others similarly situated, and the Court's contrary conclusion was based on a failure to give § 1.015(c) full effect when interpreting § 1.015(f). ECF 174 at 13–14. Plaintiffs do not explain how the Court's interpretation properly harmonizes these provisions, but simply double-down on their claim that some would-be voters have no residence at which to register. *See* ECF 182 at 9–11. Plaintiffs insist that "would-be voters cannot register at their home while temporarily away from it because, by definition, they do not 'inhabit[] the place at the time of designation and intend[] to remain there.'" *Id.* at 9 (quoting Tex. Elec. Code § 1.105(f)). But Plaintiffs misleadingly quote § 1.105(f). That provision prohibits a person from designating a "previous residence"—not a current residence—as their home if they do not inhabit it at the time. Tex. Elec. Code § 1.105(f). Section 1.105(c) provides that a person does not lose their residence by leaving it temporarily. Reading these provisions together, as one must, *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991), a would-be voter *can* register at their home while temporarily away from it, because their home does not cease to be their residence due to a temporary absence.

Plaintiffs next suggest that "[u]nrebutted expert testimony" proves that "college students are particularly likely to be left without a home for voting purposes because . . . [they] do not 'inhabit' the

8

family residences they are away from." ECF 182 at 9. But Plaintiffs' expert unsurprisingly misreads the statutory provision in the same way that Plaintiffs do. Under § 1.105(c), college students can register at their family home despite not currently inhabiting it because their family home does not cease to be their residence simply because they left it for temporary purposes. Conversely, if college students want to make their college housing their home, then that becomes their residence. Under § 1.105(d), voters are only barred from acquiring residence if the voters come to the location: (1) "for temporary purposes; *and* (2) "without the intention of making that place the person's home." The Election Code does not prevent voters from establishing a residence simply because the voters know that they will inhabit the location for a fixed period of time. In any event, courts—not experts—decide questions of law. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018). Intervenors respectfully contend that there is a substantial likelihood the Fifth Circuit will construe § 1.105(f) to be constitutional and conclude that it does not disenfranchise would-be voters, especially when Plaintiffs, including Plaintiffs' expert, have offered zero evidence of an identifiable would-be voter who has been disenfranchised.

**II. The Other Factors Favor a Stay.**

It bears repeating: if there is one "principle" that can be drawn from the Supreme Court's recent voting cases, it is that "court changes of election laws close in time to the election are strongly disfavored." *Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 567 (5th Cir. 2020) (examining *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *North Carolina v. League of Women Voters of N. C.,* 574 U.S. 927 (2014); *Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014); *Veasey v. Perry*, 574 U.S. 951 (2014); *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). Keeping this principle in mind, the Fifth Circuit, just eight weeks ago, stayed this Court's injunction of Tex. Elec. Code § 13.143(d-2), which required that voters registering to vote by fax machine to later deliver a hardcopy of their application with an original, wet signature, because of the possible effects the injunction would

have "in the crucial months leading up to the voter registration deadline." *Vote.Org v. Callanen*, 39 F.4th 297, 309 (5th Cir. 2022). The proximity to the voter registration deadline, from the Fifth Circuit's opinion in *Vote.org* to today, has narrowed considerably, meaning that the changes prompted by this Court's Order to Texas's residency requirements comes just as registrations for the November 2022 General Election reach their apex.

Nevertheless, Plaintiffs contend that altering Texas's residency laws will not undermine "election integrity" or cause "voter confusion" because, by their reasoning, "it is already illegal . . . for someone to register using a fraudulent address." *See* ECF 182 at 15. This argument, however, disregards record evidence that SB1111 was enacted in response to multiple incidents of individuals registering at false addresses to influence the outcome of an election. *See* ECF 154-1 at 16–17. The law was therefore designed to eliminate opportunities for fraud by clarifying what constituted an illegal residence as well as helping counties identify red flags, such as when voters listed an impossible address on their registration form. Also, Plaintiffs ignore the State's interest in maintaining uniform election laws in all 254 counties. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (finding that the inability to enforce duly enacted, constitutional laws inflicts irreparable harm on the State). The Fifth Circuit in *Vote.org* acknowledged that making voter registration law uniform throughout Texas "minimize[s] confusion among voters and county registrars," 39 F.4th at 309, whereas having requirements and procedures that vary between counties can lead to uncertainty and frustration as well as mistakes.

For these reasons, the public interest favors a stay. In cases like these, the interests of state officials as the appealing party often "merge with" those "of the public and therefore tip public interest in favor of a stay. *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). This is particularly true when a district court's order risks confusing voters or incentivizes them to stay away from the polls. *Purcell*, 549 U.S. at 4–5; *see also, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Plaintiffs argue that SB1111 burdens their free speech rights, altering the calculus, but

their First Amendment claim is limited to a single challenged provision, § 1.015(b), and is based on a misreading of the law. Moreover, Plaintiffs have not presented evidence that they, much less voters and other members of the public, face a credible risk of prosecution, seeing as the State adopts a narrow reading of the statute and Plaintiffs failed to depose any office with the power to enforce it.

Indeed, the only individual Plaintiffs identified that may have been affected by SB1111 was said to be confused as to whether his residence "counted as a commercial residence."[2] Pls. Mot. Summ. J. App. 164–65, ECF 141 (Harris Dep. 147:6–148:22). However, the SB1111 provision that pertains to commercial addresses is not a criminal statute, and in any event, the requirement that voters register where they live rather than where they work does not implicate expressive conduct. Thus, to the extent the Harris County Election Administrator described the voter's situation correctly, it cannot stand as evidence of public harm. The choice before this Court is therefore a well-recognized, concrete, irreparable injury suffered by the State on the one hand and speculation about the future actions of unnamed parties not before this Court on the other. In such a scenario, the public interest is best served by preserving the status quo.

## CONCLUSION

Intervenors have raised substantive and meritorious issues with this Court's Permanent Injunction that encompass serious legal questions of first impression. The Fifth Circuit therefore should be provided an opportunity to review the merits of this Court's decision before Texas's election laws are permanently enjoined right as the voter registration deadline approaches. Intervenors respectfully request that the Court grant this Motion to Stay, while the appeal is pending.

---

[2] A footnote in Plaintiffs' Response to Intervenors' Motion to Stay references a short exchange between counsel for Intervenor Paxton and Harris County Election Administrator Isabel Longoria, during which Administrator Longoria described an informal conversation she had with a photographer who had come to take her photo. ECF 182 at 16 n.1. Administrator Longoria did not have any personal knowledge regarding the photographer's situation and could not inform counsel whether the photographer was able to register to vote or what actions he ultimately took with respect to establishing his residence. Pls. Mot. Summ. J. App. 164–65, ECF 141 (Harris Dep. 147:6–148:22).

Dated: August 29, 2022               Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit

/s/  Kathleen T. Hunker
KATHLEEN T. HUNKER
Special Counsel
State Bar No. 24118415
kathleen.hunker@oag.texas.gov

Office of the Attorney General
P.O. Box 12548(MC-009)
Austin, Texas 78711-2548
Telephone (512) 463-2100
Facsimile: (512) 457-4410

*Counsel for Intervenor-Defendant Ken Paxton, in his official capacity as Attorney General of Texas*


/s/ Autumn Hamit Patterson
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
AUTUMN HAMIT PATTERSON
Texas Bar No. 24092947
apatterson@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Intervenor-Defendants Lupe C. Torres and Terrie Pendley*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2022, I electronically filed a true and correct copy of the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

/s/ *Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel